HAMLING ET AL. *v.* UNITED STATES

No. 73-507.   Argued April 15, 1974—Decided June 24, 1974

88

*Stanley Fleishman* argued the cause for petitioners Hamling et al. With him on the briefs was *Sam Rosenwein*. *Mr. Rosenwein* argued the cause for petitioners Kemp et al. With him on the briefs were *Mr. Fleishman* and *Louis S. Katz*.

*Allan Abbott Tuttle* argued the cause for the United States. With him on the brief were *Solicitor General*

*Bork, Assistant Attorney General Petersen, Jerome M. Feit,* and *Shirley Baccus-Lobel.**

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

On March 5, 1971, a grand jury in the United States District Court for the Southern District of California indicted petitioners William L. Hamling, Earl Kemp, Shirley R. Wright, David L. Thomas, Reed Enterprises, Inc., and Library Service, Inc., on 21 counts of an indictment charging use of the mails to carry an obscene book, The Illustrated Presidential Report of the Commission on Obscenity and Pornography, and an obscene advertisement, which gave information as to where, how, and from whom and by what means the Illustrated Report might be obtained, and of conspiracy to commit the above offenses, in violation of 18 U. S. C. §§ 2, 371, and 1461.[1] Prior to trial, petitioners moved to dismiss the indictment on the grounds that it failed to inform them of the charges, and that the grand jury had insufficient evidence before it to return an indictment and was improperly instructed on the law. Petitioners also challenged the petit jury panel and moved to strike the venire on the ground that there had been an unconstitutional exclusion of all persons under 25 years of age. The District Court denied all of these motions.

Following a jury trial, petitioners were convicted on 12 counts of mailing and conspiring to mail the obscene

---

*Briefs of *amici curiae* urging reversal were filed by *Melvin L. Wulf, Joel M. Gora,* and *Fred Okrand* for the American Civil Liberties Union et al.; by *Ira M. Millstein* for the Association of American Publishers, Inc.; and by *William D. North* for the American Library Assn.

[1] The indictment is reproduced in full at App. 14–31.

advertisement.[2]  On appeal, the United States Court of Appeals for the Ninth Circuit affirmed.  481 F. 2d 307 (1973).  The jury was unable to reach a verdict with regard to the counts of the indictment which charged the mailing of the allegedly obscene Illustrated Report.[3] The advertisement found obscene is a single sheet brochure mailed to approximately 55,000 persons in various parts of the United States; one side of the brochure contains a collage of photographs from the Illustrated Report; the other side gives certain information and an order blank from which the Illustrated Report could be ordered.

The Court of Appeals accurately described the photographs in the brochure as follows:

"The folder opens to a full page splash of pictures portraying heterosexual and homosexual intercourse, sodomy and a variety of deviate sexual acts.  Specifically, a group picture of nine persons, one male engaged in masturbation, a female masturbating two

[2] Each petitioner was convicted on counts 1–5 and 7–13 of the indictment.  App. 9.  Petitioner Hamling was sentenced to imprisonment for one year on the conspiracy count, and consecutive to that, concurrent terms of three years each on the 11 substantive counts, and he was fined $32,000.  Petitioner Kemp was sentenced to imprisonment for one year and one day on the conspiracy count, and consecutive to that, concurrent terms of two years each on the 11 substantive counts.  Petitioners Wright and Thomas received suspended sentences of one and one-half years, and were placed on probation for five years.  Petitioners Reed Enterprises, Inc., and Library Services, Inc., were fined $43,000 and $12,000, respectively.

[3] Those counts on which the jury was unable to reach a verdict and upon which a mistrial was declared were counts 15, 16, 17, 19, and 21.  App. 10.  After presentation of the Government's case, the District Court dismissed four of the substantive counts (6, 14, 18, and 20) for lack of proof.  App. 7; Brief for United States 6 n. 4. The obscenity *vel non* of the Illustrated Report was thus not at issue in the Court of Appeals nor is it at issue in this Court.

males, two couples engaged in intercourse in reverse fashion while one female participant engages in fellatio of a male; a second group picture of six persons, two males masturbating, two fellatrices practicing the act, each bearing a clear depiction of ejaculated seminal fluid on their faces; two persons with the female engaged in the act of fellatio and the male in female masturbation by hand; two separate pictures of males engaged in cunnilinction; a film strip of six frames depicting lesbian love scenes including a cunnilinguist in action and female masturbation with another's hand and a vibrator, and two frames, one depicting a woman mouthing the penis of a horse, and a second poising the same for entrance into her vagina." 481 F. 2d, at 316–317.[4]

The reverse side of the brochure contains a facsimile of the Illustrated Report's cover, and an order form for the Illustrated Report. It also contains the following language:

"THANKS A LOT, MR. PRESIDENT. A monumental work of research and investigation has now become a giant of a book. All the facts, all the statistics, presented in the best possible format . . . and . . . completely illustrated in black and white and full color. Every facet of the most controversial public report ever issued is covered in detail.

---

[4] The only printed words appearing on the interfold of pictures are:

"In the Katzman Studies (1970) for the Commission (see page 180), some 90 photographs were rated on five-point scales for 'obscene' and 'sexually stimulating' by the control group. Group activity scenes of the type here illustrated could have been part of the 90. Both these group sex pictures are from the Danish magazine Porno Club No. 3, supposedly this was filmed at a 'live show' night club in Copenhagen. There are many similar clubs."

"The book is a MUST for the research shelves of every library, public or private, seriously concerned with full intellectual freedom and adult selection. "Millions of dollars in public funds were expended to determine the PRECISE TRUTH about eroticism in the United States today, yet every possible attempt to suppress this information was made from the very highest levels.
"Even the President dismissed the facts, out of hand. The attempt to suppress this volume is an inexcusable insult directed at every adult in this country. Each individual MUST be allowed to make his own decision; the facts are inescapable. Many adults, MANY OF THEM, will do just that after reading this REPORT. In a truly free society, a book like this wouldn't even be necessary."

The Court of Appeals indicated that the actual report of the Commission on Obscenity and Pornography is an official Government document printed by the United States Government Printing Office. The major difference between the Illustrated Report, charged to be obscene in the indictment, and the actual report is that the Illustrated Report contained illustrations, which the publishers of the Illustrated Report said were included " 'as examples of the type of subject matter discussed and the type of material shown to persons who were part of the research projects engaged in for the Commission as basis for their *Report*.' " 481 F. 2d, at 315.

The facts adduced at trial showed that postal patrons in various parts of the country received the brochure advertising the Illustrated Report. The mailings these persons received consisted of an outer envelope, an inner return envelope addressed to Library Service, Inc., at a post office box in San Diego, California, and the brochure itself, which also identified Library Service, Inc., at the

same address, as the party responsible for the mailing. The outer envelopes bore a postmark that indicated they were mailed from North Hollywood, California, on or about January 12, 1971, and that the postage was affixed to the envelopes by a Pitney-Bowes meter number.

The mailing of these brochures was accomplished by petitioners through the use of other businesses. Approximately 55,000–58,000 of these brochures were placed in envelopes, and postage was affixed to them by one Richard and one Venita Harte, who operate the Academy Addressing and Mailing Service. The brochures and the Pitney-Bowes meter number, with which they affixed the postage, were supplied to them by one Bernard Lieberman of Regent House, Inc., of North Hollywood, California, who, on January 11, 1971, had paid the United States Postal Service to set $3,300 worth of postage on the meter number. Regent House was billed $541.15 by the Hartes for their services. Regent House in turn charged its services and costs for the postage and the Hartes' mailing service to Reed Enterprises, Inc., which paid the bill on January 19, 1971, with a check signed by petitioner Hamling.

Those individuals responding to the brochure would be sent copies of the Illustrated Report, which would be mailed with postage affixed by a second Pitney-Bowes meter number which was installed at Library Service, Inc., at the direction of an employee of Pitney-Bowes. The rental agreement for this meter was signed for Library Service by petitioner David Thomas, whom that employee identified as the person with whom he had dealt on the matter.

The evidence indicated that the individual petitioners were officers in the corporate petitioners, and also indicated that they were involved with selling the Illustrated Report, which entailed mailing out the advertising bro-

chure. Petitioner Hamling, as president of Reed Enterprises, Inc., signed the check on the corporation's behalf in payment to Regent House for the mailing of the advertisement. Petitioner Kemp was the editor of the Illustrated Report, and was vice president of Library Service, Inc., and Greenleaf Classics, Inc., which is the publisher of the Illustrated Report.[5] He signed the application on behalf of Library Service, Inc., for the post office box in San Diego, which was the same post office box on the return envelope sent with the advertisement and on the advertisement itself. Petitioner Thomas signed the rental agreement for the postage meter which was used in affixing postage for sending copies of the Illustrated Report, and which Thomas directed to be installed at Library Service.

Petitioner Wright was the secretary of Reed Enterprises, Inc., and Greenleaf Classics, Inc. Wright assisted the postal superintendent in obtaining Kemp's signature on the application for the post office box in San Diego. Wright also received a memorandum from London Press, Inc., the printer of the Illustrated Report, addressed to her as representative of Reed Enterprises, Inc., confirming the shipment of 28,537 copies of the Illustrated Report. Various other corporate documents tended to show the individual petitioners' involvement with the corporate petitioners. Both the Government and the petitioners introduced testimony from various expert witnesses concerning the obscenity *vel non* of both the Illustrated Report and the brochure.

In affirming the convictions of these petitioners for the distribution of the obscene brochure, the Court of

---

[5] Greenleaf Classics, Inc., was also indicted, but was acquitted on the counts involving the brochure, including the conspiracy count. As mentioned above, the jury was unable to reach a verdict on the counts involving the Illustrated Report. See n. 3, *supra.*

Appeals rejected various contentions made by the petitioners.  The Court of Appeals also rejected petitioners' petition for rehearing and suggestion for rehearing en banc.  We granted certiorari, 414 U. S. 1143 (1974), and now affirm the judgment of the Court of Appeals.

I

These petitioners were convicted by a jury on December 23, 1971.  App. 9.  The Court of Appeals affirmed their convictions in an opinion filed on June 7, 1973. The Court of Appeals originally denied rehearing and suggestion for rehearing en banc on July 9, 1973.  That order was withdrawn by the Court of Appeals to be reconsidered in light of this Court's decisions, announced June 21, 1973, in *Miller* v. *California,* 413 U. S. 15, and related cases,[6] and was submitted to the en banc court, by order dated August 20, 1973.[7]  On August 22, 1973, the Court of Appeals entered an order denying the

---

[6] *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49 (1973); *Kaplan* v. *California,* 413 U. S. 115 (1973); *United States* v. *12 200-ft. Reels of Film,* 413 U. S. 123 (1973); *United States* v. *Orito,* 413 U. S. 139 (1973).

[7] Upon withdrawing the original order denying rehearing for reconsideration in light of *Miller* v. *California, supra,* and the related cases, the Court of Appeals stated (Pet. for Cert. App. 39–40):

"We heretofore determined that the evidence was abundantly sufficient to meet, and the District Court's jury instructions in full compliance with, the essential elements of the *Roth-Memoirs* test.  *United States* v. *One Reel of Film,* et al., —— F. 2d —— (1st Cir. July 16, 1973, No. 73–1181) at pages 5 and 7 of the slip opinion, in considering the same problem, succinctly states:

" '*A fortiori* the more relaxed standards announced by the Supreme Court were met.

" '[W]e see no possible reason to remand, especially as the Supreme Court has just addressed itself to the construction and adequacy of the federal statute involved.  See *United States* v. *12 200-Ft. Reels of Super 8mm. Film, supra,* 41 U. S. L. W. at 4963, n. 7.' "

petition for rehearing and the suggestion for rehearing en banc.

The principal question presented by this case is what rules of law shall govern obscenity convictions that occurred prior to the date on which this Court's decision in *Miller* v. *California, supra,* and its companion cases were handed down, but which had not at that point become final. Petitioners mount a series of challenges to their convictions based upon the so-called *Memoirs* test for the proscription of obscenity. (*Memoirs* v. *Massachusetts,* 383 U. S. 413 (1966).) They also attack the judgments as failing to comply with the standards enunciated in the *Miller* cases, and conclude by challenging other procedural and evidentiary rulings of the District Court.

Questions as to the constitutionality of 18 U. S. C. § 1461,[8] the primary statute under which petitioners

---

[8] Title 18 U. S. C. § 1461 provides in pertinent part:

"Every obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance; and—

.        .        .        .        .

"Every written or printed card, letter, circular, book, pamphlet, advertisement, or notice of any kind giving information, directly or indirectly, where, or how, or from whom, or by what means any of such mentioned matters, articles, or things may be obtained or made . . . .

.        .        .        .        .

"Is declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier.

"Whoever knowingly uses the mails for the mailing, carriage in the mails, or delivery of anything declared by this section or section 3001 (e) of Title 39 to be nonmailable, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, or knowingly takes any such thing from the mails for the purpose of circulating or disposing thereof, or of aiding in the circulation or disposition thereof, shall be fined not more than $5,000 or imprisoned not more than five years, or both, for the first such

were convicted, were not strangers to this Court prior to the *Miller* decision. In *Roth* v. *United States,* 354 U. S. 476 (1957), the Court held that this statute did not offend the free speech and free press guarantees of the First Amendment, and that it did not deny the due process guaranteed by the Fifth Amendment because it was "too vague to support conviction for crime." *Id.,* at 480. That holding was reaffirmed in *United States* v. *Reidel,* 402 U. S. 351 (1971). See also *Manual Enterprises, Inc.* v. *Day,* 370 U. S. 478 (1962); *Ginzburg* v. *United States,* 383 U. S. 463 (1966). Prior to *Miller,* therefore, this Court had held that 18 U. S. C. § 1461, "applied according to the proper standard for judging obscenity, do[es] not offend constitutional safeguards against convictions based upon protected material, or fail to give men in acting adequate notice of what is prohibited." *Roth* v. *United States, supra,* at 492.

These petitioners were tried and convicted under the definition of obscenity originally announced by the Court in *Roth* v. *United States, supra,* and significantly refined by the plurality opinion in *Memoirs* v. *Massachusetts, supra.* The *Memoirs* plurality held that under the *Roth* definition

> "as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value." *Id.,* at 418.

---

offense, and shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for each such offense thereafter. . . ."

Petitioners make no contention that the instructions given by the District Court in this case were inconsistent with the test of the *Memoirs* plurality. They argue instead that the obscenity *vel non* of the brochure has not been established under the *Memoirs* test. The Court of Appeals ruled against petitioners on this score, concluding that the jury's finding that the brochure was obscene under the *Memoirs* plurality test was correct. Petitioners argue at length that their expert witnesses established that the brochure did not appeal to a prurient interest in sex, that it was not patently offensive, and that it had social value. Examining the record below, we find that the jury could constitutionally find the brochure obscene under the *Memoirs* test. Expert testimony is not necessary to enable the jury to judge the obscenity of material which, as here, has been placed into evidence. See *Paris Adult Theatre I* v. *Slaton*, 413 U. S. 49, 56 (1973); *Kaplan* v. *California*, 413 U. S. 115, 120–121 (1973); *Ginzburg* v. *United States, supra,* at 465. In this case, both the Government and the petitioners introduced testimony through expert witnesses concerning the alleged obscenity of the brochure. The jury was not bound to accept the opinion of any expert in weighing the evidence of obscenity, and we conclude that its determination that the brochure was obscene was supported by the evidence and consistent with the *Memoirs* formulation of obscenity.

Petitioners nevertheless contend that since the jury was unable to reach a verdict on the counts charging the obscenity *vel non* of the Illustrated Report itself, that report must be presumed to be nonobscene, and therefore protected by the First Amendment. From this premise they contend that since the brochure fairly advertised the Illustrated Report, the brochure must also be nonobscene. The Court of Appeals rejected this con-

tention, noting that "[t]he premise is false. The jury made no finding on the charged obscenity of the Report." 481 F. 2d, at 315. The jury in this case did not *acquit* the petitioners of the charges relating to the distribution of the allegedly obscene Illustrated Report. It instead was unable to reach a verdict on the counts charging the distribution of the Illustrated Report, and accordingly, the District Court declared a mistrial as to those counts. App. 9–10. It has, of course, long been the rule that consistency in verdicts or judgments of conviction is not required. *United States* v. *Dotterweich,* 320 U. S. 277, 279 (1943); *Dunn* v. *United States,* 284 U. S. 390, 393 (1932). "The mere fact juries may reach different conclusions as to the same material does not mean that constitutional rights are abridged. As this Court observed in *Roth* v. *United States,* 354 U. S., at 492 n. 30, 'it is common experience that different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system. Cf. *Dunlop* v. *United States,* 165 U. S. 486, 499–500.' " *Miller* v. *California,* 413 U. S., at 26 n. 9. The brochure in this case stands by itself, and must accordingly be judged. It is not, as petitioners suggest, inseparable from the Illustrated Report, and it cannot be seriously contended that an obscene advertisement could not be prepared for some type of nonobscene material. If consistency in jury verdicts as to the obscenity *vel non* of identical materials is not constitutionally required, *Miller* v. *California, supra,* the same is true *a fortiori* of verdicts as to separate materials, regardless of their similarities.

Our *Miller* decisions dealing with the constitutional aspects of obscenity prosecutions were announced after the petitioners had been found guilty by a jury, and their judgment of conviction affirmed by a panel of the Court

of Appeals. Our prior decisions establish a general rule that a change in the law occurring after a relevant event in a case will be given effect while the case is on direct review. *United States* v. *Schooner Peggy,* 1 Cranch 103 (1801); *Linkletter* v. *Walker,* 381 U. S. 618, 627 (1965); *Bradley* v. *School Board of Richmond,* 416 U. S. 696, 711 (1974). Since the judgment in this case has not become final, we examine the judgment against petitioners in the light of the principles laid down in the *Miller* cases. While the language of 18 U. S. C. § 1461 has remained the same throughout this litigation, the statute defines an offense in terms of "obscenity," and this Court's decisions, at least since *Roth* v. *United States, supra,* indicate that there are constitutional limitations which must be borne in mind in defining that statutory term. Thus any constitutional principle enunciated in *Miller* which would serve to benefit petitioners must be applied in their case.

Recognizing that the *Memoirs* plurality test had represented a sharp break with the test of obscenity as announced in *Roth* v. *United States, supra,* our decision in *Miller* v. *California* reformulated the test for the determination of obscenity *vel non:*

> "The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest . . . ; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." 413 U. S., at 24.

The Court of Appeals held on rehearing that the *Miller* cases generally prescribed a more relaxed standard of re-

view under the Federal Constitution for obscenity convictions, and that therefore petitioners could derive no benefit from the principles enunciated in those cases. See n. 7, *supra*. Petitioners concede that this observation may be true in many particulars, but that in at least two it is not. They contend that the *Miller* treatment of the concept of "national standards" necessarily invalidates the District Court's charge to the jury in their case relating to the standard by which the question of obscenity was to be judged, and they further contend that the general language of 18 U. S. C. § 1461 is, in the light of the holding in the *Miller* cases, unconstitutionally vague.

## A

The trial court instructed the jury that it was to judge the obscenity *vel non* of the brochure by reference to "what is reasonably accepted according to the contemporary standards of the community as a whole. . . . Contemporary community standards means the standards generally held throughout this country concerning sex and matters pertaining to sex. This phrase means, as it has been aptly stated, the average conscience of the time, and the present critical point in the compromise between candor and shame, at which the community may have arrived here and now." App. 241. Petitioners describe this as an instruction embodying the principle of "national standards" which, although it may have been proper under the law as it existed when they were tried, cannot be sustained under the law as laid down in *Miller*, where the Court stated:

> "Nothing in the First Amendment requires that a jury must consider hypothetical and unascertainable 'national standards' when attempting to determine whether certain materials are obscene as a matter of fact." 413 U. S., at 31–32.

Paradoxically, however, petitioners also contend that in order to avoid serious constitutional questions the standards in federal obscenity prosecutions *must* be national ones, relying on *Manual Enterprises, Inc. v. Day,* 370 U. S., at 488 (opinion of Harlan, J.), and *United States v. Palladino,* 490 F. 2d 499 (CA1 1974). Petitioners assert that our decisions in the two federal obscenity cases decided with *Miller*[9] indicate that this Court has not definitively decided whether the Constitution requires the use of nationwide standards in federal obscenity prosecutions.

We think that both of these contentions evidence a misunderstanding of our *Miller* holdings. *Miller* rejected the view that the First and Fourteenth Amendments require that the proscription of obscenity be based on uniform nationwide standards of what is obscene, describing such standards as "hypothetical and unascertainable," 413 U. S., at 31. But in so doing the Court did not require as a constitutional matter the substitution of some smaller geographical area into the same sort of formula; the test was stated in terms of the understanding of "the average person, applying contemporary community standards." *Id.,* at 24. When this approach is coupled with the reaffirmation in *Paris Adult Theatre I v. Slaton,* 413 U. S., at 56, of the rule that the prosecution need not as a matter of constitutional law produce "expert" witnesses to testify as to the obscenity of the materials, the import of the quoted language from *Miller* becomes clear. A juror is entitled to draw on his own knowledge of the views of the average person in the community or vicinage from which he comes for making the required determination, just as he is entitled to draw on his knowledge of the propensities of a "reasonable" per-

[9] *United States v. Orito,* 413 U. S. 139 (1973); *United States v. 12 200-ft. Reels of Film,* 413 U. S. 123 (1973).

son in other areas of the law.  *Stone* v. *New York, C. & St. L. R. Co.,* 344 U. S. 407, 409 (1953); *Schulz* v. *Pennsylvania R. Co.,* 350 U. S. 523, 525–526 (1956).  Our holding in *Miller* that California could constitutionally proscribe obscenity in terms of a "statewide" standard did not mean that any such precise geographic area is required as a matter of constitutional law.

Our analysis in *Miller* of the difficulty in formulating uniform national standards of obscenity, and our emphasis on the ability of the juror to ascertain the sense of the "average person, applying contemporary community standards" without the benefit of expert evidence, clearly indicates that 18 U. S. C. § 1461 is not to be interpreted as requiring proof of the uniform national standards which were criticized in *Miller.*  In *United States* v. *12 200-ft. Reels of Film,* 413 U. S. 123 (1973), a federal obscenity case decided with *Miller,* we said:

> "We have today arrived at standards for testing the constitutionality of state legislation regulating obscenity.  See *Miller* v. *California, ante,* at 23–25.  These standards are applicable to federal legislation."  *Id.,* at 129–130.

Included in the pages referred to in *Miller* is the standard of "the average person, applying contemporary community standards."  In view of our holding in *12 200-ft. Reels of Film,* we hold that 18 U. S. C. § 1461 incorporates this test in defining obscenity.

The result of the *Miller* cases, therefore, as a matter of constitutional law and federal statutory construction, is to permit a juror sitting in obscenity cases to draw on knowledge of the community or vicinage from which he comes in deciding what conclusion "the average person, applying contemporary community standards" would reach in a given case.  Since this case was tried in the Southern District of California, and presumably jurors

from throughout that judicial district were available to serve on the panel which tried petitioners, it would be the standards of that "community" upon which the jurors would draw. But this is not to say that a district court would not be at liberty to admit evidence of standards existing in some place outside of this particular district, if it felt such evidence would assist the jurors in the resolution of the issues which they were to decide.

Our Brother BRENNAN suggests in dissent that in holding that a federal obscenity case may be tried on local community standards, we do violence both to congressional prerogative and to the Constitution. Both of these arguments are foreclosed by our decision last Term in *United States* v. *12 200-ft. Reels of Film, supra,* that the *Miller* standards, including the "contemporary community standards" formulation, applied to federal legislation. The fact that distributors of allegedly obscene materials may be subjected to varying community standards in the various federal judicial districts into which they transmit the materials does not render a federal statute unconstitutional because of the failure of application of uniform national standards of obscenity. Those same distributors may be subjected to such varying degrees of criminal liability in prosecutions by the States for violations of state obscenity statutes; we see no constitutional impediment to a similar rule for federal prosecutions. In *Miller* v. *California,* 413 U. S., at 32, we cited with approval Mr. Chief Justice Warren's statement:

"[W]hen the Court said in *Roth* that obscenity is to be defined by reference to 'community standards,' it meant community standards—not a national standard, as is sometimes argued. I believe that there is no provable 'national standard,' and perhaps there should be none. At all events, this Court has not

been able to enunciate one, and it would be unreasonable to expect local courts to divine one. It is said that such a 'community' approach may well result in material being proscribed as obscene in one community but not in another, and, in all probability, that is true. But communities throughout the Nation are in fact diverse, and it must be remembered that, in cases such as this one, the Court is confronted with the task of reconciling conflicting rights of the diverse communities within our society and of individuals." *Jacobellis* v. *Ohio*, 378 U. S. 184, 200–201 (1964) (dissenting opinion).

Judging the instruction given by the District Court in this case by these principles, there is no doubt that its occasional references to the community standards of the "nation as a whole" delineated a wider geographical area than would be warranted by *Miller, 12 200-ft. Reels of Film,* and our construction of § 1461 herein, *supra,* at 105. Whether petitioners were materially prejudiced by those references is a different question. Certainly the giving of such an instruction does not render their convictions void as a matter of constitutional law. This Court has emphasized on more than one occasion that a principal concern in requiring that a judgment be made on the basis of "contemporary community standards" is to assure that the material is judged neither on the basis of each juror's personal opinion, nor by its effect on a particularly sensitive or insensitive person or group. *Miller* v. *California, supra,* at 33; *Mishkin* v. *New York,* 383 U. S. 502, 508–509 (1966); *Roth* v. *United States,* 354 U. S., at 489. The District Court's instruction in this case, including its reference to the standards of the "nation as a whole," undoubtedly accomplished this purpose.

We have frequently held that jury instructions are to be judged as a whole, rather than by picking isolated

108

phrases from them. *Boyd* v. *United States,* 271 U. S. 104, 107 (1926). In the unusual posture of this case, in which petitioners agree that the challenged instruction was proper at the time it was given by the District Court, but now seek to claim the benefit of a change in the law which casts doubt on the correctness of portions of it, we hold that reversal is required only where there is a probability that the excision of the references to the "nation as a whole" in the instruction dealing with community standards would have materially affected the deliberations of the jury. Cf. *Namet* v. *United States,* 373 U. S. 179, 190–191 (1963); *Lopez* v. *United States,* 373 U. S. 427, 436 (1963). Our examination of the record convinces us that such a probability does not exist in this case.

Our Brother BRENNAN takes us to task for reaching this conclusion, insisting that the District Court's instructions and its exclusion of the testimony of a witness, Miss Carlsen, who had assertedly conducted a survey of standards in the San Diego area require that petitioners be accorded a new trial. As we have noted, *infra,* at 124–125, the District Court has wide discretion in its determination to admit and exclude evidence, and this is particularly true in the case of expert testimony. *Stillwell Mfg. Co.* v. *Phelps,* 130 U. S. 520, 527 (1889); *Barnes* v. *Smith,* 305 F. 2d 226, 232 (CA10 1962); 2 J. Wigmore, Evidence § 561 (3d ed. 1940).[10] But even assuming that the Dis-

---

[10] The stated basis for the District Court's exclusion of the testimony of Miss Carlsen was that her survey was not framed in terms of "national" standards, but it is not at all clear that the District Court would have admitted her testimony had it been so framed. "[A] specific objection *sustained* . . . is sufficient, though naming an untenable ground, if some other tenable one existed." 1 J. Wigmore, Evidence § 18, p. 32 (3d ed. 1940), citing *Kansas City S. R. Co.* v. *Jones,* 241 U. S. 181 (1916). Miss Carlsen was a student at San Diego State University who worked part time at F. W. Woolworth, doing

trict Court may have erred in excluding the witness' testimony in light of the *Miller* cases, we think arguments made by petitioners' counsel urging the admission of the survey re-emphasize the confusing and often gossamer distinctions between "national" standards and other types of standards. Petitioners' counsel, in urging the District Court to admit the survey, stated:

"We have already had experts who have testified and expect to bring in others who have testified both for the prosecution and the defense that the material that they found was similar in all cities. . . ." Tr. 3931.

"This witness can testify about experiences she had in one particular city. Whether this is or not a typical city is for the jury to decide." *Id.*, at 3932.

"Now this supports the national survey. It is not something that stands alone. The findings here are consistent with the national survey and as part of the overall picture, taking into account, of course, that this is something that has taken place after the national survey, which was about two years ago, that Dr. Abelson performed." *Id.*, at 3934–3935.

The District Court permitted Dr. Wilson, one of the four expert witnesses who testified on behalf of petitioners, to testify as to materials he found available in San Diego, as a result of having spent several days there. *Id.*, at 3575. He was then asked by petitioners' counsel whether this material was "similar to or different than"

composition layouts of newspaper advertising for the company's store in Fashion Valley. She had undertaken a "Special Studies" course with her journalism professor, Mr. Haberstroh, who was also offered by petitioners as an expert witness at the trial. Miss Carlsen had circulated through the San Diego area and asked various persons at random whether they thought "adults should be able to buy and view this book and material." Tr. 3926.

the material found in other cities where he had also visited adult bookstores. The witness responded that he thought "essentially the same kinds of material are found throughout the United States." *Id.*, at 3577. These statements, in colloquies between counsel and Dr. Wilson, only serve to confirm our conclusion that while there may have been an error in the District Court's references to the "community standards of the nation as a whole" in its instructions, and in its stated reasons for excluding the testimony of Miss Carlsen, these errors do not require reversal under the standard previously enunciated.[11]

## B

Petitioners next argue that prior to our decision in *Miller,* 18 U. S. C. § 1461 did not contain in its language, nor had it been construed to apply to, the specific types of sexual conduct referred to in *Miller,* and therefore the section was unconstitutionally vague as applied to them

---

[11] The sequence of events in this case is quite different from that in *Saunders* v. *Shaw,* 244 U. S. 317 (1917), upon which our Brother BRENNAN relies. There the Supreme Court of Louisiana directed the entry of judgment against an intervening defendant who had prevailed in the trial court, on the basis of testimony adduced merely as an offer of proof by the plaintiff, and to which the intervening defendant had therefore had no occasion to respond. Since the trial court had ruled that the issue to which plaintiff's proof was addressed was irrelevant, this Court reversed the Supreme Court of Louisiana in order that the intervening defendant might have an opportunity to controvert the plaintiff's proof. Here petitioners were given full latitude in rebutting every factual issue dealt with in the Government's case, and no claim is made that the jury was permitted to rely on evidence introduced merely by way of offer of proof which was not subject to cross-examination or to contradiction by countervailing evidence offered by the petitioners. The present case seems to us much closer to *Ginzburg* v. *United States, 383* U. S. 463 (1966), than to *Saunders.*

in the prosecution of these cases. Such an argument, however, not only neglects this Court's decisions prior to *Miller* rejecting vagueness challenges to the federal statute, but also fundamentally misconceives the thrust of our decision in the *Miller* cases.

In *Roth* v. *United States,* 354 U. S., at 491, we upheld the constitutionality of 18 U. S. C. § 1461 against a contention that it did "not provide reasonably ascertainable standards of guilt and therefore violate[s] the constitutional requirements of due process." In noting that the federal obscenity statute made punishable the mailing of material that is "obscene, lewd, lascivious, or filthy . . . [and of] other publication[s] of an indecent character," the Court stated in *Roth:*

> "Many decisions have recognized that these terms of obscenity statutes are not precise. This Court, however, has consistently held that lack of precision is not itself offensive to the requirements of due process. '. . . [T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. . . .' *United States* v. *Petrillo,* 332 U. S. 1, 7–8. These words, applied according to the proper standard for judging obscenity, already discussed, give adequate warning of the conduct proscribed and mark '. . . boundaries sufficiently distinct for judges and juries fairly to administer the law . . . . That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense. . . .' *Id.,* at 7." 354 U. S., at 491–492 (footnote omitted).

Other decisions dealing with the pre-*Miller* constitution-

ality or interpretation of 18 U. S. C. § 1461 in other contexts have not retreated from the language of *Roth.* See, *e. g., United States* v. *Reidel,* 402 U. S. 351 (1971); *Ginzburg* v. *United States,* 383 U. S. 463 (1966); *Manual Enterprises, Inc.* v. *Day,* 370 U. S. 478 (1962). And as made clear by the opinion of Mr. Justice Harlan in *Manual Enterprises,* the language of 18 U. S. C. § 1461 had been, prior to the date of our decision in *Miller,* authoritatively construed in a manner consistent with *Miller:*

> "The words of section 1461, 'obscene, lewd, lascivious, indecent, filthy or vile,' connote something that is portrayed in a manner so offensive as to make it unacceptable under current community *mores.* While in common usage the words have different shades of meaning, the statute since its inception has always been taken as aimed at obnoxiously debasing portrayals of sex. Although the statute condemns such material irrespective of the *effect* it may have upon those into whose hands it falls, the early case of *United States* v. *Bennett,* 24 Fed. Cas. 1093 (No. 14571), put a limiting gloss upon the statutory language: the statute reaches only indecent material which, as now expressed in *Roth* v. *United States, supra,* at 489, 'taken as a whole appeals to prurient interest.' " 370 U. S., at 482–484 (footnotes omitted) (emphasis in original).

At no point does *Miller* or any of the other obscenity decisions decided last Term intimate that the constitutionality of pre-*Miller* convictions under statutes such as 18 U. S. C. § 1461 was to be cast in doubt. Indeed, the contrary is readily apparent from the opinions in those cases. We made clear in *Miller,* 413 U. S., at 24 n. 6, that our decision was not intended to hold all state statutes inadequate, and we clearly recognized that existing statutes

"as construed heretofore or hereafter, may well be adequate." That recognition is emphasized in our opinion in *United States* v. *12 200-ft. Reels of Film,* 413 U. S. 123 (1973). That case had come to this Court on appeal from the District Court's dismissal of the Government's forfeiture action under 19 U. S. C. § 1305 (a), which statute the District Court had found unconstitutional. In vacating the District Court's constitutional decision and remanding the case to the District Court for a determination of the obscenity *vel non* of the materials there involved, we stated:

> "We further note that, while we must leave to state courts the construction of state legislation, we do have a duty to authoritatively construe federal statutes where 'a serious doubt of constitutionality is raised' and ' "a construction of the statute is fairly possible by which the question may be avoided." ' *United States* v. *Thirty-seven Photographs,* 402 U. S. 363, 369 (1971) (opinion of WHITE, J.), quoting from *Crowell* v. *Benson,* 285 U. S. 22, 62 (1932). If and when such a 'serious doubt' is raised as to the vagueness of the words 'obscene,' 'lewd,' 'lascivious,' 'filthy,' 'indecent,' or 'immoral' as used to describe regulated material in 19 U. S. C. § 1305 (a) and 18 U. S. C. § 1462, see *United States* v. *Orito,* [413 U. S.,] at 140 n. 1, we are prepared to construe such terms as limiting regulated material to patently offensive representations or descriptions of that specific 'hard core' sexual conduct given as examples in *Miller* v. *California,* [413 U. S.,] at 25. See *United States* v. *Thirty-seven Photographs, supra,* at 369–374 (opinion of WHITE, J.). Of course, Congress could always define other specific 'hard core' conduct." 413 U. S., at 130 n. 7.

*Miller* undertook to set forth examples of the types of

material which a statute might proscribe as portraying sexual conduct in a patently offensive way, 413 U. S., at 25–26, and went on to say that no one could be prosecuted for the "sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct specifically defined by the regulating state law, as written or construed." *Id., at* 27. As noted above, we indicated in *United States* v. *12 200-ft. Reels of Film, supra,* at 130 n. 7, that we were prepared to construe the generic terms in 18 U. S. C. § 1462 to be limited to the sort of "patently offensive representations or descriptions of that specific 'hard core' sexual conduct given as examples in *Miller* v. *California."* We now so construe the companion provision in 18 U. S. C. § 1461, the substantive statute under which this prosecution was brought. As so construed, we do not believe that petitioners' attack on the statute as unconstitutionally vague can be sustained.

*Miller,* in describing the type of material which might be constitutionally proscribed, 413 U. S., at 25, was speaking in terms of substantive constitutional law of the First and Fourteenth Amendments. See *Jenkins* v. *Georgia, post,* at 160–161. While the particular descriptions there contained were not intended to be exhaustive, they clearly indicate that there is a limit beyond which neither legislative draftsmen nor juries may go in concluding that particular material is "patently offensive" within the meaning of the obscenity test set forth in the *Miller* cases. And while the Court in *Miller* did refer to "specific prerequisites" which "will provide fair notice to a dealer in such materials," 413 U. S., at 27, the Court immediately thereafter quoted the language of the Court in *Roth* v. *United States,* 354 U. S., at 491–492, concluding with these words:

   " 'That there may be marginal cases in which it is difficult to determine the side of the line on which

a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense. . . .' " 413 U. S., at 28 n. 10.

The *Miller* cases, important as they were in enunciating a constitutional test for obscenity to which a majority of the Court subscribed for the first time in a number of years, were intended neither as legislative drafting handbooks nor as manuals of jury instructions. Title 18 U.S.C. § 1461 had been held invulnerable to a challenge on the ground of unconstitutional vagueness in *Roth;* the language of *Roth* was repeated in *Miller,* along with a description of the types of material which could constitutionally be proscribed and the adjuration that such statutory proscriptions be made explicit either by their own language or by judicial construction; and *United States* v. *12 200-ft. Reels of Film, supra,* made clear our willingness to construe federal statutes dealing with obscenity to be limited to material such as that described in *Miller.* It is plain from the Court of Appeals' description of the brochure involved here that it is a form of hard-core pornography well within the types of permissibly proscribed depictions described in *Miller,* and which we now hold § 1461 to cover. Whatever complaint the distributor of material which presented a more difficult question of obscenity *vel non* might have as to the lack of a previous limiting construction of 18 U. S. C. § 1461, these petitioners have none. See *Dennis* v. *United States,* 341 U. S. 494, 511–515 (1951) (opinion of Vinson, C. J.).

Nor do we find merit in petitioners' contention that cases such as *Bouie* v. *City of Columbia,* 378 U. S. 347 (1964), require reversal of their convictions. The Court in *Bouie* held that since the crime for which the petitioners there stood convicted was "not enumerated in the statute" at the time of their conduct, their conviction could not be sustained. *Id.,* at 363. The Court noted that "a

deprivation of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Id.*, at 352. But the enumeration of specific categories of material in *Miller* which might be found obscene did not purport to make criminal, for the purpose of 18 U. S. C. § 1461, conduct which had not previously been thought criminal. That requirement instead added a "clarifying gloss" to the prior construction and therefore made the meaning of the federal statute involved here "more definite" in its application to federal obscenity prosecutions. *Bouie* v. *City of Columbia, supra,* at 353. Judged by both the judicial construction of § 1461 prior to *Miller,* and by the construction of that section which we adopt today in the light of *Miller,* petitioners' claims of vagueness and lack of fair notice as to the proscription of the material which they were distributing must fail.

## C

Petitioners' final *Miller*-based contention is that our rejection of the third part of the *Memoirs* test and our revision of that test in *Miller* indicate that 18 U. S. C. § 1461 was at the time of their convictions unconstitutionally vague for the additional reason that it provided insufficient guidance to them as to the proper test of "social value." But our opinion in *Miller* plainly indicates that we rejected the *Memoirs* "social value" formulation, not because it was so vague as to deprive criminal defendants of adequate notice, but instead because it represented a departure from the definition of obscenity in *Roth,* and because in calling on the prosecution to "prove a negative," it imposed a "[prosecutorial] burden virtually impossible to discharge" and not constitutionally required. 413 U. S., at 22. Since *Miller* per-

mits the imposition of a lesser burden on the prosecution in this phase of the proof of obscenity than did *Memoirs,* and since the jury convicted these petitioners on the basis of an instruction concededly based on the *Memoirs* test, petitioners derive no benefit from the revision of that test in *Miller.*

## II

Petitioners attack the sufficiency of the indictment under which they were charged for two reasons: first, that it charged them only in the statutory language of 18 U. S. C. § 1461, which they contend was unconstitutionally vague as applied to them; and, second, that the indictment failed to give them adequate notice of the charges against them. As noted above, however, at the time of petitioners' convictions, *Roth* v. *United States* had held that the language of § 1461 was not "too vague to support conviction for crime." 354 U. S., at 480. See *United States* v. *Reidel,* 402 U. S., at 354.

Our prior cases indicate that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. *Hagner* v. *United States,* 285 U. S. 427 (1932); *United States* v. *Debrow,* 346 U. S. 374 (1953). It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as "those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *United States* v. *Carll,* 105 U. S. 611, 612 (1882). "Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused

of the specific offence, coming under the general description, with which he is charged." *United States* v. *Hess,* 124 U. S. 483, 487 (1888).

*Russell* v. *United States,* 369 U. S. 749 (1962), relied upon by petitioners, does not require a finding that the indictment here is insufficient. In *Russell,* the indictment recited the proscription of 2 U. S. C. § 192, and charged that the defendants had refused to answer questions that "were pertinent to the question then under inquiry" by a committee of Congress. In holding that the indictment was insufficient because it did not state the subject which was under inquiry, this Court stated:

> "[T]he very core of criminality under 2 U. S. C. § 192 is pertinency to the subject under inquiry of the questions which the defendant refused to answer. What the subject actually was, therefore, is central to every prosecution under the statute. Where guilt depends so crucially upon such *a specific identification of fact,* our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute." 369 U. S., at 764 (emphasis added).

The definition of obscenity, however, is not a question of fact, but one of law; the word "obscene," as used in 18 U. S. C. § 1461, is not merely a generic or descriptive term, but a legal term of art. See *Roth* v. *United States,* 354 U. S., at 487–488; *Manual Enterprises, Inc.* v. *Day,* 370 U. S., at 482–487 (opinion of Harlan, J.); *United States* v. *Thevis,* 484 F. 2d 1149, 1152 (CA5 1973), cert. pending, No. 73–1075; *United States* v. *Luros,* 243 F. Supp. 160, 167 (ND Iowa), cert. denied, 382 U. S. 956 (1965). The legal definition of obscenity does not change with each indictment; it is a term sufficiently definite in legal meaning to give a defendant notice of the charge against him. *Roth* v. *United States, supra,*

at 491–492; *Manual Enterprises, Inc.* v. *Day, supra,* at 482–487 (opinion of Harlan, J.). Since the various component parts of the constitutional definition of obscenity need not be alleged in the indictment in order to establish its sufficiency, the indictment in this case was sufficient to adequately inform petitioners of the charges against them.[12]

Petitioners also contend that in order for them to be convicted under 18 U. S. C. § 1461 for the crime of mailing obscene materials, the Government must prove that they knew the materials mailed were obscene. That statute provides in pertinent part that "[w]hoever knowingly uses the mails for the mailing . . . of anything declared by this section . . . to be nonmailable . . ." is guilty of the proscribed offense. Consistent with the statute, the District Court instructed the jury, *inter alia,* that in order to prove specific intent on the part of these petitioners, the Government had to demonstrate that petitioners "knew the envelopes and packages containing the subject materials were mailed or placed . . . in Interstate Commerce, and . . . that they had knowledge of the character of the

---

[12] Petitioners' further contention that our remand to the District Court in *United States* v. *Orito,* 413 U. S. 139 (1973), for reconsideration of the sufficiency of the indictment in light of *Miller* and *United States* v. *12 200-ft. Reels of Film,* indicates that the sufficiency of their indictment is in question misses the mark. In *Orito,* we reviewed a District Court judgment which had dismissed an indictment under 18 U. S. C. § 1462 and held the statute unconstitutional. In upholding the statute and vacating the judgment of the District Court, we remanded the case for reconsideration of the indictment in light of *Miller* and *12 200-ft. Reels,* which had, of course, enunciated new standards for state and federal obscenity prosecutions, and for reconsideration in light of our opinion reversing the District Court's holding that the statute was unconstitutional. Here of course, the District Court and the Court of Appeals have already upheld both the sufficiency of the indictment and the constitutionality of 18 U. S. C. § 1461, and we agree with their rulings.

materials." App. 236. The District Court further instructed that the "[petitioners'] belief as to the obscenity or non-obscenity of the material is irrelevant." *Ibid.*

Petitioners contend that this instruction was improper and that proof of scienter in obscenity prosecutions requires, "at the very least, proof both of knowledge of the contents of the material and awareness of the obscene character of the material." Brief for Petitioner Kemp 31–32. In support of this contention, petitioners urge, as they must, that we overrule our prior decision in *Rosen* v. *United States,* 161 U. S. 29 (1896). We decline that invitation, and hold that the District Court in this case properly instructed the jury on the question of scienter.

In *Rosen* v. *United States, supra,* this Court was faced with the question of whether, under a forerunner statute to the present 18 U. S. C. § 1461, see Rev. Stat. § 3893, 19 Stat. 90, c. 186, a charge of mailing obscene material must be supported by evidence that a defendant "knew or believed that such [material] could be properly or justly characterized as obscene . . . ." 161 U. S., at 41. The Court rejected this contention, stating:

"The statute is not to be so interpreted. The inquiry under the statute is whether the paper charged to have been obscene, lewd, and lascivious was in fact of that character, and if it was of that character and was deposited in the mail by one who knew or had notice at the time of its contents, the offence is complete, although the defendant himself did not regard the paper as one that the statute forbade to be carried in the mails. Congress did not intend that the question as to the character of the paper should depend upon the opinion or belief of the person who, with knowledge or notice of its contents, assumed the responsibility of putting it in the mails of the United States. The evils that Congress sought to

> remedy would continue and increase in volume if the belief of the accused as to what was obscene, lewd, and lascivious was recognized as the test for determining whether the statute has been violated." *Id.,* at 41–42.

Our subsequent cases have not retreated from this general rule, as a matter of either statutory or constitutional interpretation, nor have they purported to hold that the prosecution must prove a defendant's knowledge of the legal status of the materials he distributes.

In *Smith* v. *California,* 361 U. S. 147 (1959), this Court was faced with a challenge to the constitutionality of a Los Angeles ordinance which had been construed by the state courts as making the proprietor of a bookstore absolutely liable criminally for the mere possession in his store of a book later judicially determined to be obscene, even though he had no knowledge of the contents of the book. The Court held that the ordinance could not constitutionally eliminate altogether a scienter requirement, and that, in order to be constitutionally applied to a book distributor, it must be shown that he had "knowledge of the contents of the book." *Id.,* at 153. The Court further noted that "[w]e need not and most definitely do not pass today on what sort of mental element is requisite to a constitutionally permissible prosecution of a bookseller for carrying an obscene book in stock." *Id.,* at 154.

*Smith* does not support petitioners' claim in this case, since it dealt with an ordinance which totally dispensed with any proof of scienter on the part of the distributor of obscene material. Nor did the Court's decision in *Manual Enterprises, Inc.* v. *Day, supra,* also relied upon by petitioners, suggest otherwise. There Mr. Justice Harlan's opinion, recognizing that scienter was required for a criminal prosecution under 18 U. S. C. § 1461, rejected the Government's contention that such a require-

ment was unnecessary in an administrative determination by the Post Office Department that certain materials were nonmailable under that section. That opinion concluded that the obscene advertising proscription of the federal statute was not applicable in such an administrative determination unless the publisher of the materials knew that at least some of his advertisers were offering to sell obscene material. Such proof was deemed lacking and therefore the publishers could not be administratively prohibited from mailing the publications.[13]

Significantly, a substantially similar claim to the instant one was rejected by this Court in *Mishkin* v. *New York,* 383 U. S. 502 (1966). In examining a New York statute, the Court there noted that the New York Court of Appeals had "authoritatively interpreted" the statutory provision to require the "vital element of scienter" and that it had defined the required mental element as follows:

> " 'A reading of the [New York] statute ... as a whole clearly indicates that only those who are in some manner aware of the *character* of the material they attempt to distribute should be punished. It is not innocent but *calculated purveyance* of filth which is exorcised ....' " *Id.,* at 510 (emphasis in original), quoting from *People* v. *Finkelstein,* 9 N. Y. 2d 342, 344–345, 174 N. E. 2d 470, 471 (1961).

The Court emphasized that this construction of the New York statute "foreclosed" the defendant's challenge to

---

[13] MR. JUSTICE BRENNAN, joined by Mr. Chief Justice Warren and MR. JUSTICE DOUGLAS, concluded that 18 U. S. C. § 1461 does not authorize the Postmaster General to employ any administrative process of his own to close the mails to matter which, in his view, falls within the ban of that section. *Manual Enterprises, Inc.* v. *Day,* 370 U. S. 478, 495–519 (1962) (separate opinion).

the statute based on *Smith* v. *California, supra,* and stated:

> "The Constitution requires proof of scienter to avoid the hazard of self-censorship of constitutionally protected material and to compensate for the ambiguities inherent in the definition of obscenity. The New York definition of the scienter required by [the New York statute] amply serves those ends, and therefore fully meets the demands of the Constitution. Cf. *Roth* v. *United States,* 354 U. S., at 495–496 (WARREN, C. J., concurring)." 383 U. S., at 511.

The *Mishkin* holding was reaffirmed in *Ginsberg* v. *New York,* 390 U. S. 629 (1968). There the Court was again faced with the sufficiency of the scienter requirement of another New York statute, which proscribed the "knowing" distribution of obscene materials to minors. "Knowingly" was defined in the statute as "knowledge" of, or "reason to know" of, the character and content of the material. Citing *Mishkin,* and the New York Court of Appeals' construction of the other similar statutory language, the Court rejected the challenge to the scienter provision.

We think the "knowingly" language of 18 U. S. C. § 1461, and the instructions given by the District Court in this case satisfied the constitutional requirements of scienter. It is constitutionally sufficient that the prosecution show that a defendant had knowledge of the contents of the materials he distributed, and that he knew the character and nature of the materials. To require proof of a defendant's knowledge of the legal status of the materials would permit the defendant to avoid prosecution by simply claiming that he had not brushed up on the law. Such a formulation of the scienter requirement

is required neither by the language of 18 U. S. C. § 1461 nor by the Constitution.

> "Whenever the law draws a line there will be cases very near each other on opposite sides. The precise course of the line may be uncertain, but no one can come near it without knowing that he does so, if he thinks, and if he does so it is familiar to the criminal law to make him take the risk." *United States* v. *Wurzbach,* 280 U. S. 396, 399 (1930).

Petitioners also make a broad attack on the sufficiency of the evidence. The general rule of application is that "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser* v. *United States,* 315 U. S. 60, 80 (1942). The primary responsibility for reviewing the sufficiency of the evidence to support a criminal conviction rests with the Court of Appeals, which in this case held that the Government had satisfied its burden. We agree. Based on the evidence before it, the jury was entitled to conclude that the individual petitioners, as corporate officials directly concerned with the activities of their organizations, were aware of the mail solicitation scheme, and of the contents of the brochure. The evidence is likewise sufficient to establish the existence of a conspiracy to mail the obscene brochure. The existence of an agreement may be shown by circumstances indicating that criminal defendants acted in concert to achieve a common goal. See, *e. g., Blumenthal* v. *United States,* 332 U. S. 539, 556–558 (1947).

## III

We turn now to petitioners' attack on certain evidentiary rulings of the District Court. Petitioners have very much the laboring oar in showing that such rulings constitute reversible error, since "in judicial trials, the

whole tendency is to leave rulings as to the illuminating relevance of testimony largely to the discretion of the trial court that hears the evidence." *NLRB* v. *Donnelly Co.,* 330 U. S. 219, 236 (1947); *Michelson* v. *United States,* 335 U. S. 469, 480 (1948); *Salem* v. *United States Lines Co.,* 370 U. S. 31, 35 (1962).

Petitioners offered in evidence at trial three categories of allegedly comparable materials argued to be relevant to community standards: (1) materials which had received second-class mailing privileges; (2) materials which had previously been the subject of litigation and had been found to be "constitutionally protected"; and (3) materials openly available on the newsstands. The District Court, after examining the materials, refused to admit them into evidence on the grounds that "they tend to confuse the jury" and "would serve no probative value in comparison to the amount of confusion and deluge of material that could result therefrom." App. 158. The Court of Appeals concluded that the District Court was correct in rejecting the proffered evidence, stating that any abuse of discretion in refusing to admit the materials themselves had been "cured by the District Court's offer to entertain expert testimony with respect to the elements to be shown for the advice of the jury." 481 F. 2d, at 320. Here the District Court permitted four expert witnesses called by petitioners to testify extensively concerning the relevant community standards.

The defendant in an obscenity prosecution, just as a defendant in any other prosecution, is entitled to an opportunity to adduce relevant, competent evidence bearing on the issues to be tried. But the availability of similar materials on the newsstands of the community does not automatically make them admissible as tending to prove the nonobscenity of the materials which the defendant is charged with circulating. As stated by

the Court of Appeals, the mere fact that materials similar to the brochure at issue here "are for sale and purchased at book stores around the country does not make them witnesses of virtue." *Ibid.* Or, as put by the Court of Appeals in *United States* v. *Manarite,* 448 F. 2d 583 (CA2 1971):

> "Mere availability of similar material by itself means nothing more than that other persons are engaged in similar activities." *Id.,* at 593.

Nor do we think the District Court erred in refusing petitioners' offer of a magazine which had received a second-class mailing privilege.[14] While federal law, see former 39 U. S. C. § 4354 (1964 ed.); 39 CFR Pt. 132 (1973), may lay down certain standards for the issuance of a second-class mailing permit, this Court has held that these standards give postal inspectors no power of censorship. *Hannegan* v. *Esquire, Inc.,* 327 U. S. 146 (1946). The mere fact that a publication has acquired a second-class mailing privilege does not therefore create any presumption that it is not obscene.

Finally, we do not think the District Court abused its discretion in refusing to admit certain allegedly comparable materials, a film and two magazines,[15] which had been found to be nonobscene by this Court. See *Pinkus* v. *Pitchess,* 429 F. 2d 416 (CA9), aff'd *sub nom. California* v. *Pinkus,* 400 U. S. 922 (1970); *Burgin* v. *South Carolina,* 404 U. S. 806 (1971), rev'g 255 S. C. 237, 178 S. E. 2d 325 (1970). A judicial determination that particular matters are not obscene does not necessarily make them relevant to the determination of the obscenity of

---

[14] The magazine offered was entitled Nude Living, No. 63. The foundation alleged for its admissibility was that it had received a second-class mailing privilege. App. 212–213.

[15] Brief for Petitioner Kemp 69.

other materials, much less mandate their admission into evidence.

Much of the material offered by petitioners was not of demonstrated relevance to the issues in this case. Such of it as may have been clearly relevant was subject to the District Court's observation that it would tend to create more confusion than enlightenment in the minds of the jury, and to the court's expressed willingness to permit the same material to be treated in the testimony of expert witnesses. The District Court retains considerable latitude even with admittedly relevant evidence in rejecting that which is cumulative, and in requiring that which is to be brought to the jury's attention to be done so in a manner least likely to confuse that body. We agree with the Court of Appeals that the District Court's discretion was not abused.[16]

Petitioners' second contention is that the District Court erred in instructing the jury as to the determination of the prurient appeal of the brochure. At the trial, the Government introduced, over petitioners' objection, testimony from an expert witness that the material in the Illustrated Report appealed to the prurient interest of various deviant sexual groups.[17] The testimony concerning the brochure was that it appealed to a prurient

---

[16] Other proffered materials, alleged to be comparable, included numerous magazines and films, and also the survey (see n. 10, *supra*) conducted by the student at San Diego State University of the reactions of people in the San Diego area to the Illustrated Report and the brochure. Brief for Petitioner Kemp 64–71.

[17] Petitioners also contend that this evidence was at variance with the Government's answer to their Bill of Particulars. Brief for Petitioner Hamling 49–50. The Court of Appeals assumed, without deciding, that such evidence did constitute a variance, but concluded that "such variance was in no wise a surprise or prejudice to the defendants as their own expert opinion testimony interwove and covered the same field completely." 481 F. 2d, at 322. We agree with the Court of Appeals.

interest in general, and not specifically to some deviant group.  Petitioners concede, however, that each of the pictures said to appeal to deviant groups did in fact appear in the brochure.[18]  The District Court accordingly instructed the jury that in deciding whether the predominant appeal of the Illustrated Report and the brochure was to a prurient interest in sex, it could consider whether some portions of those materials appealed to a prurient interest of a specifically defined deviant group as well as whether they appealed to the prurient interest of the average person.  App. 239–241.  The Court of Appeals found no error in the instruction, since it was "manifest that the District Court considered that some of the portrayals in the Brochure might be found to have a prurient appeal" to a deviant group.  481 F. 2d, at 321.

Petitioners contend that the District Court's instruction was improper because it allowed the jury to measure the brochure by its appeal to the prurient interest not only of the average person but also of a clearly defined deviant group.  Our decision in *Mishkin* v. *New York*, 383 U. S. 502 (1966), clearly indicates that in measuring the prurient appeal of allegedly obscene materials, *i. e.*, whether the "dominant theme of the material taken as a whole appeals to a prurient interest in sex," consideration may be given to the prurient appeal of the material to clearly defined deviant sexual groups.  Petitioners appear to argue that if some of the material appeals to the prurient interest of sexual deviants while other parts appeal to the prurient interest of the average person, a general finding that the material appeals to a prurient interest in sex is somehow precluded.  But we stated in *Mishkin* v. *New York*:

> "Where the material is designed for and primarily disseminated to a clearly defined deviant sexual

---

[18] Brief for Petitioner Hamling 49–50.

group, rather than the public at large, the prurient-appeal requirement of the *Roth* test is satisfied if the dominant theme of the material taken as a whole appeals to the prurient interest in sex of the members of that group. The reference to the 'average' or 'normal' person in *Roth,* 354 U. S., at 489–490, does not foreclose this holding. . . . We adjust the prurient-appeal requirement to social realities by permitting the appeal of this type of material to be assessed in terms of the sexual interests of its intended and probable recipient group; and since our holding requires that the recipient group be defined with more specificity than in terms of sexually immature persons, it also avoids the inadequacy of the most-susceptible-person facet of the [*Regina* v.] *Hicklin* [[1868] L. R. 3 Q. B. 360] test." 383 U. S., at 508–509 (footnotes omitted).

The District Court's instruction was consistent with this statement in *Mishkin.* The jury was instructed that it must find that the materials as a whole appealed generally to a prurient interest in sex. In making that determination, the jury was properly instructed that it should measure the prurient appeal of the materials as to all groups. Such an instruction was also consistent with our recent decision in the *Miller* cases. We stated in *Miller:*

"As the Court made clear in *Mishkin* v. *New York,* 383 U. S., at 508–509, the primary concern with requiring a jury to apply the standard of 'the average person, applying contemporary community standards' is to be certain that, *so far as material is not aimed at a deviant group,* it will be judged by its impact on an average person, rather than a particularly susceptible or sensitive person—or indeed

a totally insensitive one." 413 U. S., at 33 (emphasis added).

Finally, we similarly think petitioners' challenge to the pandering instruction given by the District Court is without merit. The District Court instructed the jurors that they must apply the three-part test of the plurality opinion in *Memoirs* v. *Massachusetts*, 383 U. S., at 418, and then indicated that the jury could, in applying that test, if it found the case to be close, also consider whether the materials had been pandered, by looking to their "[m]anner of distribution, circumstances of production, sale, . . . advertising . . . . [and] editorial intent . . . ." App. 245. This instruction was given with respect to both the Illustrated Report and the brochure which advertised it, both of which were at issue in the trial.

Petitioners contend that the instruction was improper on the facts adduced below and that it caused them to be "convicted" of pandering. Pandering was not charged in the indictment of the petitioners, but it is not, of course, an element of the offense of mailing obscene matter under 18 U. S. C. § 1461. The District Court's instruction was clearly consistent with our decision in *Ginzburg* v. *United States*, 383 U. S. 463 (1966), which held that evidence of pandering could be relevant in the determination of the obscenity of the materials at issue, as long as the proper constitutional definition of obscenity is applied. Nor does the enactment by Congress of 39 U. S. C. § 3008, enabling the Postal Service to cease forwarding pandering advertisements at the request of an addressee, authorize, as contended by petitioners, the pandering of obscene advertisements. That statute simply gives a postal recipient the means to insulate himself from advertisements which offer for sale matter "which the addressee in his sole discretion believes to be erotically arousing or sexually provocative," by

instructing the Post Office to order the sender to refrain from mailing any further advertisements to him. See *Rowan* v. *U. S. Post Office Dept.*, 397 U. S. 728 (1970). The statute does not purport to authorize the mailing of legally obscene pandering advertisements, which continues to be proscribed by 18 U. S. C. § 1461. See 39 U. S. C. § 3011 (e).

## IV

Petitioners' final contentions are directed at alleged procedural irregularities said to have occurred during the course of the trial.

They first contend that the District Court committed reversible error by denying their request to make additional objections to the court's instructions to the jury out of the presence of the jury. Prior to closing arguments and instructions to the jury the parties had made a record with respect to the instructions which the Court indicated it would give. After argument and instructions, but before the jury had retired, petitioners' counsel approached the bench and requested that the jury be excused in order that he might present further objections to the charge. The court declined to excuse the jury, saying:

> "You have made all the objections suitable that I can think of. I want to send this Jury out. If you want to make a statement, make a statement." App. 257.

Petitioners contend that the court's refusal to excuse the jury violated the provisions of Fed. Rule Crim. Proc. 30, and requires reversal. Rule 30 provides:

> "At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the re-

quests. At the same time copies of such requests shall be furnished to adverse parties. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. *Opportunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury.*" (Emphasis added.)

Nothing in Rule 30 transfers from the district court to counsel the function of deciding at what point in the trial, consistent with established practice, counsel shall be given the opportunity required by Rule 30 to make a record on the instructions given by the court. But when counsel at the close of the court's instruction to the jury indicates that he wishes to make objections of a kind which could not previously have been brought to the court's attention, he runs the risk of waiving a claim of error under the fourth sentence of the Rule unless the court indicates that it will permit such objections to be made after the jury retires. Since the court here asked counsel for comments, and did not indicate that it would permit objections which could not have been previously formulated to be made after the jury retired, we agree with the Court of Appeals that the District Court erred in refusing to permit such objections to be made out of the presence of the jury. We also agree with the Court of Appeals' conclusion that such procedural error does not mandate reversal.

The courts of appeals have taken varying approaches to the question of when a failure to comply with the pro-

visions of Rule 30 constitutes reversible error.[19]  Some
appear to have applied a general rule that such a viola-
tion is not reversible error unless the defendant demon-
strates that he has been prejudiced.  *United States* v.
*Hall,* 200 F. 2d 957 (CA2 1953); *United States* v. *Titus,*
221 F. 2d 571 (CA2), cert. denied, 350 U. S. 832 (1955);
*United States* v. *Fernandez,* 456 F. 2d 638 (CA2 1972);
*Hodges* v. *United States,* 243 F. 2d 281 (CA5 1957); *Sul-
tan* v. *United States,* 249 F. 2d 385 (CA5 1957).  Others
appear to have adopted a rule whereby a violation is not
reversible error where it affirmatively appears that the
defendant was not prejudiced.  *United States* v. *Schart-
ner,* 426 F. 2d 470 (CA3 1970); *Lovely* v. *United States,*
169 F. 2d 386 (CA4 1948).  At least one Court of Appeals
appears to take the position that the failure to comply
with Rule 30 is automatic grounds for reversal, regard-
less of attenuating circumstances.  *Hall* v. *United States,*
378 F. 2d 349 (CA10 1967).

[19] Federal Rule Civ. Proc. 51 states that "[o]pportunity shall be
given to make the objection out of the hearing of the jury."  Though
the "out of the presence of the jury" language is not contained in
that Rule, the Advisory Committee's note attending Fed. Rule Crim.
Proc. 30 states that it is to "correspond to Rule 51 of the Federal
Rules of Civil Procedure . . . . It seemed appropriate that on a
point such as instructions to juries there should be no difference in
procedure between civil and criminal cases."  The Government
argues that in considering whether failure to comply with Fed. Rule
Crim. Proc. 30 requires reversal, the appropriate test should be
similar to the general standard of consideration where there is a
failure to comply with Fed. Rule Civ. Proc. 51, *i. e.,* reversal is re-
quired "if there is reasonable basis for concluding that the colloquy
had in the presence of the jury as a result of the judge's ignoring or
denying a proper request was prejudicial." *Swain* v. *Boeing Airplane
Co.,* 337 F. 2d 940, 943 (CA2 1964), cert. denied, 380 U. S. 951
(1965).  This approach was used by a panel of the Court of Appeals
for the Second Circuit in a case involving failure to comply with
Fed. Rule Crim. Proc. 30.  *United States* v. *Fernandez,* 456 F. 2d 638
(1972).

The Court of Appeals in this case felt that the rule announced by the Third Circuit in *United States* v. *Schartner, supra,* was the appropriate one for application where Rule 30 has not been complied with. The court in *Schartner* held that a District Court's failure to comply with the "out of the presence of the jury" requirement of Rule 30, upon proper request by a party, constitutes reversible error "unless it be demonstrable on an examination of the whole record that the denial of the right did not prejudice" the defendant's case. 426 F. 2d, at 480. Applying that rule, the Court of Appeals here concluded that there was no prejudice to any of the petitioners as a result of the District Court's failure to comply with Rule 30.

The language in Rule 30 at issue here was added to that Rule by a 1966 amendment; prior to that time the Rule had only provided that a party should be given the opportunity to make the objection out of the *hearing* of the jury. The significance of the change was not elaborated by the Advisory Committee in its note accompanying the Rule, which merely mentioned the change. Courts examining the Rule have found that it is principally designed to avoid the subtle psychological pressures upon the jurors which would arise if they were to view and hear defense counsel in a posture of apparent antagonism toward the judge. *Lovely* v. *United States, supra,* at 391; *Hodges* v. *United States, supra,* at 283–284; *United States* v. *Schartner, supra,* at 479. While that goal might be served in many cases by a sufficiently low-tone bench conference, the ultimate way to assure the goal is to comply with the Rule.

Petitioners urge that we adopt a strict approach and declare that any noncompliance with the Rule requires reversal. We think such an approach would be unduly mechanical, and would be inconsistent with interpretation

*in pari materia* of Rule 30 and other relevant provisions of the Federal Rules of Criminal Procedure, since Rule 52 (a) specifically provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." This provision suggests the soundness of an approach similar to that of the Court of Appeals here and the various other Courts of Appeals, *supra,* which have in some manner examined the prejudice to the defendant in deciding whether reversal is required where there is a failure to comply with Rule 30.

We conclude that the Court of Appeals did not err in refusing to reverse petitioners' convictions for the failure to comply with the provisions of Rule 30. The Court of Appeals felt that it should apply the somewhat stricter test of the *Schartner* case, *supra;* the court felt that "the rule of *Fernandez,* [456 F. 2d 638 (CA2 1972),] places a burden upon a defendant in a criminal case that he may not be able to carry." 481 F. 2d, at 324. Applying the *Schartner* test, the Court of Appeals determined that there was no prejudice to petitioners from the failure to hold the instruction-objection session out of the presence of the jury. Our independent examination of that bench conference convinces us that the holding of the Court of Appeals was correct. The bench conference was one of many at the trial and there is no indication in the record that the discussion was heard by the jury. The colloquy between petitioners' counsel and the court concerned purely legal issues, App. 257–265, and the District Court had prior to that point indicated its rulings with respect to the instructions requested by counsel. We express no view, of course, as to whether a court of appeals may follow the apparently more lenient standard of requiring the defendant to demonstrate that he was prejudiced. See *United States* v. *Fernandez,* 456 F. 2d, at 643–644.

Petitioners' second procedural contention is that the

trial jury was improperly constituted because an allegedly cognizable class of citizens, "young adults," which petitioners define as those between the ages of 18 and 24 years, were systematically excluded.[20]   Petitioners therefore argue that the District Court abused its discretion in refusing to grant a continuance until a new jury, which would have presumably contained a greater ratio of young persons, was drawn.

At the time of petitioners' indictment and trial, the jury-selection plan of the Southern District of California, adopted pursuant to 28 U. S. C. §§ 1863 (b)(2) and (4), 82 Stat. 55, provided for the periodic emptying and refilling of the master jury wheel from voter registration lists.   At that point, it had been slightly less than four years since the jury wheel in the District had last been filled.   Petitioners' argument is that because the jury wheel had last been filled in 1968, the youngest potential juror for their trial was at least 24 years old. The petitioner called as a witness the Clerk of the Southern District of California, who testified that within one month the master wheel would be refilled with the names of persons who then appeared on the voters' registration list and that the master list would then contain the names of persons 21 years of age and over.   Tr. 94–98.   A 1972 amendment to 28 U. S. C. § 1863 (b)(4) (1970 ed., Supp. II) provided that the periodic emptying and refilling of the master wheel should occur at specified intervals, "not [to] exceed four years."   Pub. L. No. 92–269, § 2, 86 Stat. 117.   The District Court denied petitioners' motion to strike the venire, but stated that the evidence presented

---

[20] In connection with their motion to strike the venire, petitioners introduced evidence which they contended established that "young persons were a cognizable group and that they were more tolerant than older persons in matters pertaining to the depiction of sexually explicit material."   Brief for Petitioner Hamling 88.

indicated that "it is time to change the jury master wheel." Tr. 93. The petitioners then moved for a continuance of approximately one month, so that their jury would be drawn from a master wheel that included the names of persons 21 years of age or over. *Id.*, at 95–98. The District Court denied the motion.

The Court of Appeals assumed, without deciding, that the young do constitute a cognizable group or class, but concluded that petitioners had "failed to show, let alone establish, a purposeful systematic exclusion of the members of that class whose names, but for such systematic exclusion would otherwise be selected for the master jury wheel," and therefore that the District Court's refusal to grant a continuance was not an abuse of discretion. 481 F. 2d, at 314. We agree with the Court of Appeals.

Petitioners do not cite case authority for the proposition that the young are an identifiable group entitled to a group-based protection under our prior cases, see *Hernandez* v. *Texas,* 347 U. S. 475, 479–480 (1954) ; claims of exclusion of the young from juries have met with little success in the federal courts.[21] Assuming, as did the Court of Appeals, that the young are such a group, we do not believe that there is evidence in this case sufficient to make out a prima facie case of discrimination which would in turn place the burden on the Government to overcome it. The master wheel under the Southern District of California plan, as under plans in other judicial districts, is periodically emptied and then refilled with names from the available voter lists. Persons added to the voter lists subsequent to one filling of the jury

---

[21] See, *e. g., United States* v. *Butera,* 420 F. 2d 564 (CA1 1970) ; *United States* v. *Camara,* 451 F. 2d 1122 (CA1 1971) ; *United States* v. *Gooding,* 473 F. 2d 425 (CA5 1973) ; *United States* v. *Kuhn,* 441 F. 2d 179 (CA5 1971) ; *United States* v. *Gast,* 457 F. 2d 141 (CA7), cert. denied, 406 U. S. 969 (1972).

wheel are therefore not added to the wheel until the next refilling. But some play in the joints of the jury-selection process is necessary in order to accommodate the practical problems of judicial administration. Congress could reasonably adopt procedures which, while designed to assure that "an impartial jury [is] drawn from a cross-section of the community," *Thiel* v. *Southern Pacific Co.,* 328 U. S. 217, 220 (1946); *Smith* v. *Texas,* 311 U. S. 128, 130 (1940), at the same time take into account practical problems in judicial administration. Unless we were to require the daily refilling of the jury wheel, Congress may necessarily conclude that some periodic delay in updating the wheel is reasonable to permit the orderly administration of justice.[22] Invariably of course, as time goes on, the jury wheel will be more and more out of date, especially near the end of the statutorily prescribed time period for updating the wheel. But if the jury wheel is not discriminatory when completely updated at the time of each refilling, a prohibited "purposeful discrimination" does not arise near the end of the period simply because the young and other persons have belatedly become eligible for jury service by becoming registered voters. *Whitus* v. *Georgia,* 385 U. S. 545, 551 (1967); see *Avery* v. *Georgia,* 345 U. S. 559 (1953); *Alexander* v. *Louisiana,* 405 U. S. 625 (1972). Since petitioners failed to establish a discriminatory exclusion of the young from their jury, the District Court properly exercised its discretion in refusing to grant petitioners' motion for a continuance.

Petitioners' third procedural contention is that the District Court erred in refusing to ask certain questions on

---

[22] Various delays in refilling jury wheels have been upheld by the federal courts. *E. g., United States* v. *Pentado,* 463 F. 2d 355 (CA5 1972) (three years); *United States* v. *Gooding, supra* (three years, four months); *United States* v. *Kuhn, supra* (five years).

*voir dire* concerning possible religious and other biases of the jurors.[23] Specifically, petitioners requested the court to ask questions as to whether the jurors' educational, political, and religious beliefs might affect their views on the question of obscenity. App. 78–81. The Court of Appeals concluded that the District Court's examination on the *voir dire* of the prospective jurors "was full, complete and . . . fair to the [petitioners] as contemplated by Rule 24 (a), Federal Rules of Criminal Procedure." 481 F. 2d, at 314. Noting that petitioners had requested the submission of numerous questions to the petit panel, the Court of Appeals stated:

> "The District Court asked many of the questions as submitted, many in altered and consolidated form, and declined to ask many others which were cumulative and argumentative. The handling of those questions not asked was clearly within the range of the District Court's discretion in the matter and no clear abuse of the discretion nor prejudice to the [petitioners] has been shown." *Ibid.*

We agree with the Court of Appeals. Federal Rule Crim. Proc. 24 (a) permits a district court to conduct the *voir dire* examination, making such use of questions submitted by the parties as it deems proper. The District Court here asked questions similar to many of those sub-

---

[23] Petitioners also contend that certain actions of the Government's attorney before the grand jury prejudiced that body against them. The Court of Appeals, in rejecting this contention, stated:

"The record before us is totally lacking of any evidence or showing of any kind that any member of the Grand Jury was biased or prejudiced in any degree against any of the [petitioners], except only a supposition as to how the members may have reacted upon a view of the Brochure and Report. The presumption of regularity which attaches to Grand Jury proceedings still abides. . . . [T]he assignment has no merit." 481 F. 2d, at 313 (citations omitted).

We agree with the Court of Appeals.

mitted by petitioners, and its examination was clearly sufficient to test the qualifications and competency of the prospective jurors. Petitioners' reliance on this Court's decisions in *Aldridge* v. *United States,* 283 U. S. 308 (1931), and *Ham* v. *South Carolina,* 409 U. S. 524 (1973), is misplaced. Those cases held that in certain situations a judge must inquire into possible racial prejudices of the jurors in order to satisfy the demands of due process. But in *Ham* v. *South Carolina, supra,* we also rejected a claim that the trial judge had erred in refusing to ask the jurors about potential bias against beards, noting our inability "to constitutionally distinguish possible prejudice against beards from a host of other possible similar prejudices . . . ." *Id.,* at 528. Here, as in *Ham,* the trial judge made a general inquiry into the jurors' general views concerning obscenity. Failure to ask specific questions as to the possible effect of educational, political, and religious biases did "not reach the level of a constitutional violation," *ibid.,* nor was it error requiring the exercise of our supervisory authority over the administration of justice in the federal courts. We hold that the District Court acted within its discretion in refusing to ask the questions.

The judgment of the Court of Appeals for the Ninth Circuit in this case is

*Affirmed.*

Mr. Justice Douglas, dissenting.

In 1970 the President's Commission on Obscenity and Pornography issued its report. Dean William D. Lockhart was chairman. Eighteen others were members. It was a 646-page report. One member, Charles H. Keating, Jr., filed a dissenting report of some 60 pages with at least as many pages of exhibits. The report contains many references to many facets of sex: *e. g.,* petting,

coitus, oral sexuality, masturbation, and homosexual activities.

What petitioners did was to supply the report with a glossary—not in dictionary terms but visually. Every item in the glossary depicted explicit sexual material within the meaning of that term as used in the report. Perhaps we should have no reports on obscenity. But imbedded in the First Amendment is the philosophy that the people have the right to know.*  Sex is more important to some than to others but it is of some importance to all.  If officials may constitutionally report on obscenity, I see nothing in the First Amendment that allows us to bar the use of a glossary factually to illustrate what the report discusses.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE STEWART and MR. JUSTICE MARSHALL join, dissenting.

I

Whatever the constitutional power of government to *regulate* the distribution of sexually oriented materials, the First and Fourteenth Amendments, in my view, deny the Federal and State Governments power wholly to *suppress* their distribution.  For I remain of the view that, "at least in the absence of distribution to juveniles or obtrusive exposure to unconsenting adults, the First and Fourteenth Amendments prohibit the State and Federal

---

*The Constitution of India (Mar. 1, 1963) provides in Art. 19 (1) that "[a]ll citizens shall have the right—(a) to freedom of speech and expression"; but Art. 19 (2) provides that nothing in that clause bars "reasonable restrictions on the exercise" of those rights "in the interests of . . . decency or morality." Our First Amendment contains no such qualification and certainly when Jefferson and Madison drafted it, sex had as great a potential for vulgarity as for beauty.  If they had wanted a federal censor to edit our publications, they certainly would have made it explicit.

Governments from attempting wholly to suppress sexually oriented materials on the basis of their allegedly 'obscene' contents." *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49, 113 (1973) (BRENNAN, J., dissenting). Since amended 18 U. S. C. § 1461, as construed by the Court, aims at total *suppression* of distribution by mail of sexually oriented materials, it is, in my view, unconstitutionally overbroad and therefore invalid on its face. On that ground alone, I would reverse the judgment of the Court of Appeals and direct the dismissal of the indictment. Several other reasons, however, also compel the conclusion that petitioners' convictions should be set aside.

## II

At least since 1962 the accepted construction of amended § 1461 has been that of Mr. Justice Harlan and MR. JUSTICE STEWART "that the proper test under this federal statute, [§ 1461,] reaching as it does to all parts of the United States whose population reflects many different ethnic and cultural backgrounds, is a national standard of decency"; further, they said, "[t]he 1958 amendments . . . authorizing criminal prosecution at the place of delivery evince no purpose to make the standard less than national." *Manual Enterprises, Inc.* v. *Day,* 370 U. S. 478, 488, and n. 10 (1962). The Court today overrules that construction and construes amended § 1461 to permit a juror to "draw on knowledge of the community or vicinage from which he comes in deciding what conclusion 'the average person, applying contemporary community standards' would reach in a given case." *Ante,* at 105. Apart from the questions whether the Court's new construction trespasses upon the congressional prerogative, see *Blount* v. *Rizzi,* 400 U. S. 410, 419 (1971),[1]

---

[1] The Court is, of course, obliged to strain to construe congressional enactments to avoid constitutional attacks. It cannot, how-

and whether constitutionally any "local" standard under amended § 1461 can properly be employed to delineate the area of expression protected by the First Amendment, see *Pennekamp* v. *Florida,* 328 U. S. 331, 335 (1946)—since "[i]t is, after all, a national Constitution we are expounding," *Jacobellis* v. *Ohio,* 378 U. S. 184, 195 (1964) (opinion of BRENNAN, J.)—the construction that a "local" standard applies in § 1461 cases raises at least another serious First Amendment problem.

The 1958 amendments to § 1461 constituted the mailing of obscene matter a continuing offense under 18 U. S. C. § 3237.[2] The practical effect of this amend-

---

ever, emasculate a statute to avoid a perceived constitutional difficulty, see *Aptheker* v. *Secretary of State,* 378 U. S. 500, 515 (1964); *George Moore Ice Cream Co.* v. *Rose,* 289 U. S. 373, 379 (1933). The legislative history of § 1461 gives not the slightest indication that the application of local standards was contemplated. Indeed, the remarks of an early sponsor of the provision indicate that application of a national standard was intended:

"If there be a trial in this country or anywhere else of an obscene character—of that character that a report of it would corrupt the morals of the youth and the *morals of the country generally*—then I do not think the United States should provide the means to circulate that kind of literature in whatever paper or in whatever book it may be published." 4 Cong. Rec. 696 (1876) (remarks of Rep. Cannon) (emphasis added).

[2] Prior to the amendment § 1461 read, "[w]hoever knowingly *deposits* for mailing or delivery . . ." (emphasis added). This was changed to read "[w]hoever knowingly *uses the mails* . . . ." The amendment overruled *United States* v. *Ross,* 205 F. 2d 619 (CA10 1953), which held that the unlawful act proscribed in § 1461 was "the deposit for mailing and not a use of the mails which may follow such deposit," *id.,* at 621, and thus brought § 1461 within 18 U. S. C. § 3237, which provides in relevant part that "[a]ny offense involving the use of the mails, or transportation in interstate or foreign commerce, is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such

ment—intentionally adopted by Congress for that express purpose—is to permit prosecution "in the Federal district in which [the disseminator] mailed the obscenity, in the Federal district in which the obscenity was received, or in any Federal district through which the obscenity passed while it was on its route through the mails." 104 Cong. Rec. 15610–15611 (1958) (remarks of Rep. Hillings); see H. R. Rep. No. 2624, 85th Cong., 2d Sess. (1958); 104 Cong. Rec. 8991 (remarks of Rep. Keating); *id.*, at 17832; *id.*, at 8992 (remarks of Rep. Poff). Under today's "local" standards construction, therefore, the guilt or innocence of distributors of identical materials mailed from the same locale can now turn on the chancy course of transit or place of delivery of the materials. See *United States* v. *Palladino,* 490 F. 2d 499, 503 (CA1 1974) (Coffin, C. J.). National distributors choosing to send their products in interstate travels will be forced to cope with the community standards of every hamlet into which their goods may wander. Because these variegated standards are impossible to discern, national distributors, fearful of risking the expense and difficulty of defending against prosecution in any of several remote communities, must inevitably be led to retreat to debilitating self-censorship that abridges the First Amendment rights of the people. For it "would tend to restrict the public's access to forms [of sexually oriented materials] which the [United States] could not constitutionally suppress directly . . . a censorship . . . hardly less virulent for being privately administered[, for] [t]hrough it, the distribution of all [sexually oriented materials], both obscene and not obscene, would be impeded." *Smith* v. *California,* 361 U. S. 147, 154 (1959). Thus, the people of many communities will be "protected" far beyond gov-

---

commerce or mail matter moves." See generally Note, Venue: Its Impact on Obscenity, 11 S. D. L. Rev. 363 (1966).

ernment's constitutional power to deny them access to sexually oriented materials. A construction that has such consequences necessarily renders the constitutionality of amended § 1461 facially suspect under the First Amendment.

## III

But even on the assumption that amended § 1461 is invulnerable to constitutional attack, the Court's affirmance of these convictions is a patently indefensible denial to these petitioners of due process of law. The trial judge followed *Manual Enterprise*'s construction of amended § 1461 that required a determination of guilt upon the basis of a "national" standard of decency. The Court holds that under today's new "local" standards construction, this was error. Yet, says the Court, the error in effect was harmless because the references in the instructions to "national" standards could not have "materially affected [the jurors'] deliberations . . . ." *Ante,* at 108. The trial transcript lays bare the utter fallacy of that conclusion.

First, the Court appraises the trial court's references to "national" standards as "isolated," and cites *Boyd* v. *United States,* 271 U. S. 104, 107 (1926), *ante,* at 107–108, where the Court held that an ambiguous statement in a charge in a criminal case, which, interpreted one way, would be erroneous, but which considered with the charge as a whole, probably was understood by the jurors in a harmless sense, is not a ground for reversal. But to represent the references to "national" standards in the court's instructions as "isolated," and probably understood by the jury in a harmless sense, is completely to misread the instructions. The emphasis on "national" standards is the very core of the instructions, because the trial judge made "national" standards the central criterion of the determination of the obscenity of the brochure.

He referred to "national" standards in his instructions no less than 18 times, 14 of them within the space of four transcript pages.[3] Indeed, his emphasis made such an

---

[3] The portion of the instructions containing the 14 references is as follows:

"Now, as to the second test, another requirement to be applied in determining whether the material in evidence is obscene, is whether the material is patently offensive in that it goes substantially beyond what is reasonably accepted according to the contemporary standards of the community as a whole, *the national community as a whole*. In applying this test you must consider each book or advertisement as a whole and not part by part. You must measure the material by contemporary or current *national community* standards and determine whether the material so exceeds the customary limits of candor in the descriptions and representations of sex and nudity which are reasonably acceptable in the *national community*, that they are patently offensive.

"Contemporary community standards means the standards generally held *throughout this country* concerning sex and matters pertaining to sex. The phrase means, as it has been aptly stated, the average conscience of the time, and the present critical point in the compromise between candor and shame, at which the community may have arrived here and now.

"You are the sole judges of the contemporary community *standards of this country*. In arriving at and applying your judgment, however, you are not to consider your own standards. That is, of what is good or what is bad. You are not to condemn by your own standards, if you know and believe them to be stricter than those generally held, and you are not to exculpate or excuse by your own standards, if you know and believe them to be more tolerant than those that are generally held. You are not to limit yourself to what you have learned while residing in your present locality or what you have learned or observed from and about people residing in your present locality. Rather, you are to call upon everything you have learned, seen, read, and observed from both the evidence presented at the trial and the experience you have gained from your own observations and experience in your affairs of life.

"If you find the materials in evidence to substantially exceed the limits of candor in the descriptions and representations of sex which

impression upon the jurors' minds that they returned from the jury room and requested that the trial judge re-read them this portion of the instructions. See Tr. 4989–4990.[4]

---

are acceptable in the *national community*, then you may find the material to be patently offensive.

"You will note that the book and advertisement here involved cannot be found to be obscene unless the evidence shows beyond a reasonable doubt that these materials substantially exceed customary limits of candor in *the nation as a whole* in the description and representation of sex and nudity.

"The word 'substantially' has been defined as greatly or considerably, or largely. The contemporary community *standards of the nation,* are set by what is, in fact, reasonably accepted by the *national community as a whole.* That is to say, by society at large or people in general *throughout the nation,* and not by what some persons or groups of persons may believe *the national community* as a whole ought to accept or refuse to accept. It is a matter of common knowledge of which the Court takes judicial notice, that the customs change and that *the national community as a whole* may, from time to time, find acceptable that which was formerly unacceptable.

"Now, in determining and applying contemporary *national community standards,* you must consider what appears generally in magazines, books, newspapers, television, burlesque, night clubs, novels, motion pictures, the stage, and other media of communications in *the nation as a whole,* insofar as social value is concerned." Tr. 4948–4951; App. 241–243 (emphasis supplied).

Four additional references to national standards appear at pages 4945, 4953, and 4960 of the trial transcript.

[4] Petitioners' failure to object to the national-standards instructions can hardly be used to shift to their shoulders any burden of demonstrating prejudice. See *O'Connor* v. *Ohio,* 385 U. S. 92 (1966). The Court's reliance upon *Namet* v. *United States,* 373 U. S. 179, 190–191 (1963), and *Lopez* v. *United States,* 373 U. S. 427, 436 (1963), cases in which defendants failed to object to instructions which were erroneous at the time the jury was instructed and in which the defendants were therefore required to demonstrate that the instructions constituted "plain error," are thus inapt.

Of at least as much—if not more—significance, the trial judge's refusal to permit the defense to offer proof of "local" standards evidences how utterly mistaken is the Court's surmise that the emphasis upon "national" standards in the instructions could not have "materially affected" the deliberations of the jurors. Virginia Carlsen was offered as a defense witness. Trial was in the Southern District of California which covers San Diego and Imperial Counties. Miss Carlsen testified that, under the supervision of a professor at San Diego State University, she polled San Diego residents to ascertain their reaction to the brochure. The trial judge refused to admit the results of her survey in evidence, despite a side-bar offer of proof that it would demonstrate that a substantial majority of the 718 persons interviewed had expressed the view that the brochure should be generally available to the public. Significantly, the survey was excluded by the trial judge *solely* on the ground that "[y]ou can't use a piece of a standard as the standard," thus emphasizing that guilt was to be predicated on violation of a national standard, or not at all. The colloquy at side bar was as follows:

"MR. KATZ. . . . The questions on the survey I think are self-explanatory. She showed people the Illustrated Report; she showed people the survey—I mean the advertisement in the questionnaire, and recorded their responses and calculated them on the basis of sex and on the basis of age, and I think the jury should be entitled, your Honor, to use this as one of the tests they use in deciding what is [*sic*] community standards and what weight should be given to it is a question for the jury.

"THE COURT. Well, I don't agree with you, Mr. Katz, at all.

"I think you have a *national standard* here. You

are going to have to stay with your *national standard.*

"I think it does go to the admissibility. *You can't use a piece of a standard as the standard. If that were true, you would defeat the entire general standard.*

"So I am not going to permit you to go any further with this witness with respect to this." Tr. 3932–3933 (emphasis supplied).

"MR. FLEISHMAN.... I think whatever limitations your Honor would put on it would be correct, but I think it would be and should be admitted for whatever weight it has.

"THE COURT. *No. It is a national standard and I don't think this is the proper way to go about determining the national standard." Id.,* at 3937 (emphasis supplied).

The affirmance of petitioners' convictions in these circumstances plainly denies petitioners due process of law in violation of the principle of *Saunders* v. *Shaw,* 244 U. S. 317 (1917). There, the plaintiff sought to enjoin collection of a drainage tax. At trial, the trial judge ruled inadmissible plaintiff's evidence that his land would not benefit from certain drainage improvements. Defendant therefore offered no proof that the plaintiff's lands would benefit and prevailed at trial. The State Supreme Court reversed and granted a permanent injunction against the tax upon finding from the answer and testimony before it that the land had not been, and could not be, benefited. We reversed, holding that it was a violation of due process of law for a State Supreme Court to reverse a case and render judgment absolute, against a defendant who succeeded in the trial court, upon a proposition of fact that was ruled to be immaterial at the trial and concerning

which the defendant had therefore no occasion and no proper opportunity to introduce rebuttal evidence.

Petitioners' situation in this case is identical with that of the defendant in *Saunders*. Petitioners, too, were denied at trial admission of evidence upon a proposition of fact that was ruled immaterial and concerning which they therefore had no proper opportunity to introduce their proof. Had petitioners been aware that the proper criterion was the "local" standard, not only were they prepared to offer proof of the "local" standard, but obviously the strategy of their defense would have been completely different. To affirm their convictions without affording them opportunity to try the case on the "local" standards basis is a clear denial of due process. *Saunders* was, of course, a civil case. But the principle there announced surely has even greater application where, as here, criminal convictions carrying long prison sentences are involved.

> "The right to present evidence is, of course, essential to the fair hearing required by the Due Process Clause. . . . And . . . this right becomes particularly fundamental when the proceeding allegedly results in a finding that a particular individual was guilty of a crime." *Jenkins* v. *McKeithen*, 395 U. S. 411, 429 (1969) (opinion of MARSHALL, J.).

But in addition to the palpable absurdity of the Court's surmises that introduction of the San Diego study could not have affected the jurors' deliberations, and that petitioners would not have introduced additional evidence or done anything materially different had they known the jurors would be instructed on local standards, the Court's assertion that the jurors could not have ruled differently if instructed to apply local, not national, standards evinces a claim of omniscience hardly mortal. It is the more remarkable in light of the contrary

supposition of *Miller* v. *California,* 413 U. S. 15 (1973), that a jury instructed to apply national standards could indeed reach a different conclusion from what it might if instructed to apply local standards:

> "It is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City. . . . People in different States vary in their tastes and attitudes, and this diversity is not to be strangled by the absolutism of imposed uniformity." *Id.,* at 32–33.

Indeed, *Miller* rejected the "national" standards test on the ground, *inter alia,* that a "local" standard would allow a given community to apply a more permissive test:

> "The use of 'national' standards . . . necessarily implies that materials found tolerable in some places, but not under the 'national' criteria, will nevertheless be unavailable where they are acceptable." *Id.,* at 32 n. 13.

Yet for the purpose of affirming these convictions the Court holds in effect that the local standards of jurors drawn from the Southern District of California could not possibly be more permissive than those of the Nation as a whole.[5]

---

[5] It may be that the Court's unarticulated assumption is that jurors instructed to apply "national" standards will inevitably apply the standards of their local community, because national standards are simply "unascertainable." But to say that it may be difficult or even impossible to determine national standards is a far cry from saying that the jurors—instructed that it is their solemn duty to apply the law as pronounced by the Court—would not attempt to do so; or, indeed, that they would not reach a conclusion that the national standards differed from those of their local community.

The Court's affirmance, in addition to denying due process in its refusal to apply the *Saunders* principle, also denies petitioners due process in another way. It is abundantly clear that petitioners' convictions are sustained upon a charge wholly different from that upon which they were tried. They were tried upon a charge of violating "national" standards and their convictions are affirmed as if they were tried for violating "local" standards. Under the law long settled by our cases, treating a conviction as a conviction upon a charge not made is a denial of due process of law. *Cole* v. *Arkansas,* 333 U. S. 196 (1948); *Eaton* v. *Tulsa,* 415 U. S. 697 (1974). A distaste, however strong, for commercial vendors of alleged pornography is no justification for denying petitioners the application of the principle imposed upon the courts of Arkansas and Oklahoma in those cases. Ours may be the final voice, but that is the greater reason for meticulous discharge of our responsibility to dispense evenhanded justice. The least to which petitioners are entitled is vacation of their convictions and a remand for a new trial.