UNITED STATES of America,
Plaintiff-Appellee,

v.

Jose Maria Rios SOLIS,
Defendant-Appellant.

No. 79–5204.

United States Court of Appeals,
Fifth Circuit.

Feb. 27, 1980.

---

Karen K. Brown, Asst. Federal Public Defender, Houston, Tex., for Jose Solis.

James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before COLEMAN, Chief Judge, and FRANK M. JOHNSON, Jr., and POLITZ, Circuit Judges.

COLEMAN, Chief Judge.

In this case the jury acquitted Solis of conspiracy to import marijuana but convicted him of conspiracy to possess and distribute it. The grave question in the case is whether, viewing the evidence in the light most favorable to the verdict, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the evidence was sufficient to support the conviction. We find that it was not, and reverse the conviction.

Solis was tried for conspiracy along with his brothers and another individual. Government testimony was provided by an unindicted co-conspirator, Rolando Esquivel, by a motel manager, and by certain telephone records.

### 1976 Events

According to the testimony of Esquivel, he made contact with the Solis family for the first time in 1976, through a mutual friend, Freilan Guajardo, who had worked for the Solis brothers hauling watermelons and marijuana. Francisco Solis contacted Esquivel about a job and met him at a friend's house in Weslaco, Texas. They went to Francisco's parents' house, where Francisco informed Esquivel that the next morning there would be a marijuana haul from the river. Esquivel stayed at the parents' house overnight.

The next morning, Francisco, Jose, and two other Mexicans picked up Esquivel and took him to Jose's house. Jose was apparently driving at this time and explaining later directions to Esquivel.

Esquivel testified:

A. Yes, sir. When we first left from Francisco's parents' house Jose was driving.

Q. Jose was driving what?

A. The pick-up. Okay, I was just, you know, driving in the pick-up, not driving but just a passenger, you know, and when we were going up there he was telling me do it this way but we didn't have no meeting, where you're going to have to stop, we didn't have no meeting like that. (T., p. 206).

After arriving at Jose's house, Esquivel helped them fix a flat on an old blue Ford pickup and put two large boxes in the back of the truck (T., p. 49). There was no evidence indicating which individuals specifically placed the boxes in the back of the truck.

Esquivel and one of the Mexicans then drove to the river in the Ford pickup. The Mexican was driving at this time.

A. Well, they had a blue truck, old Ford pick-up and it was flat so we went ahead and fixed the flat. We put two large boxes in the back of the truck and then, so I took off with this guy from Mexico to the river.

Q. Who was driving?

A. The guy from Mexico.

Q. Who was in the truck?

A. Me and the guy from Mexico.

Q. Did you know where you were going?

A. Not really.

(T., p. 49).

At the river Esquivel and the Mexican met five other Mexicans who had come across the river with six or seven bags and several suitcases of marijuana. These were loaded on the truck and Esquivel was told by the accompanying Mexican to drive out alone to the highway to meet someone to lead him to the Solis' ranch. After reaching the highway and driving on it for several minutes, Jose and Juan Solis passed Esquivel in a car and motioned Esquivel to follow them. Esquivel could not recall which one was driving and which one motioned to him. They led Esquivel to Francisco's ranch where they took the truck and gave Esquivel the car to take to the Solis' parents' house. This exchange occurred in front of the ranch and Esquivel did not enter the ranch with Jose and Juan. Esquivel then proceeded to the parents' house.

Esquivel later met Francisco at the parents' house and arranged to transport some marijuana to Falfurrias, Texas, for safekeeping. Esquivel followed an unidentified man in a green Dodge truck to Falfurrias, where they loaded the marijuana from the truck into Esquivel's car. A second load was later brought around midnight by this person and Juan. The marijuana stored in Esquivel's car was then loaded in tool boxes on the pickup used to carry the second load of marijuana. The following day Esquivel drove to Francisco's ranch in Weslaco and was paid $350 for hauling and storing the marijuana.

Regarding this first transaction, testimony revealed the following conclusion:

Q. At the river. Right? Now, list for me the people who were involved in the marijuana deal in 1976 when you all got it from the river which one of the Solis, which one of the defendants were involved in that?

A. Juan is one of them, Francisco Solis is another one. I saw David that morning but I don't think he was involved but Jose is.

(T., p. 57).

It must be borne in mind, of course, that all this occurred in 1976 and Jose was not being charged with, or prosecuted for, what happened that year.

### 1977 Events

About a year later, around August, 1977, Esquivel called Francisco Solis and asked for a job. Francisco instructed him to come to Weslaco. Esquivel, accompanied by his brother-in-law, went to Francisco's house and there met Francisco and a man named Lupe. He then followed Francisco and Lupe to Harlingen, Texas, where Francisco left his car to be repaired and Esquivel picked them up to return to Weslaco. On the way back, while stopping for gas, out of the presence of the brother-in-law, Francisco asked Esquivel to take some heroin to Houston, Texas. Upon returning to Weslaco, the four men went to the Play-More Lounge. Francisco and Lupe went inside the lounge and after a short time returned with a package, which was placed under the right front seat of Esquivel's car without Esquivel's brother-in-law knowing about it. Another defendant, Simon Alvarez, joined them at this time and let Francisco and Lupe ride in his pick-up, while Esquivel followed them, through a checkpoint in Falfurrias. Once in Falfurrias, Esquivel took his brother-in-law home and then followed Alvarez, Francisco, and Lupe to Houston. Jose, the appellant, did not go to Houston. In Houston, Alvarez, Francisco, Lupe, and Esquivel went to a bar where they met Encarnarion Solis (known as "Chon") and an unknown man. While in the bar, Francisco, Encarnarion, and Lupe left and did not return for several hours. After they returned and all five men were leaving the bar, Francisco told Esquivel that the package in his car had been removed.

Following this incident, all five men went to the Carrousel Motel, where Alvarez registered for the night. Francisco, Lupe, Alvarez, and Esquivel stayed overnight at the motel and Encarnarion returned to his apartment.

After Esquivel testified about the heroin transaction, the testimony continued:

Q. Okay, now, would you give me the names of all the Solis brothers and anyone else who were involved in the heroin transaction?

A. Francisco, Lupe, Simon and Chon was there too.

The next day Encarnarion Solis picked up Esquivel and asked him to drive a car with one to two hundred pounds of marijuana in it. Esquivel drove Encarnarion's green car and followed Encarnarion in Alvarez's truck to several bars. While in the second bar, Francisco and another person joined them. After several hours they all left, but the green car driven by Esquivel had been taken. Esquivel next saw that car the following morning in an apartment parking lot. He drove it back to Weslaco, Texas, leaving his own car in Houston. After returning to Weslaco, Esquivel went to Juan Solis' house to await plans to fly back to Houston to get his car. These plans did not work out, however, and Esquivel agreed to drive the green car back to Houston for Juan, with still another load of marijuana. He followed David Solis up the highway to the Sarrita checkpoint. David drove a red and white Ford pickup and acted as surveillance for Esquivel up to the checkpoint. Prior to arrival at the checkpoint, David turned around. Esquivel was stopped at the Sarrita checkpoint and arrested.

Through the witness Esquivel no evidence was introduced connecting Jose Solis with the heroin or marijuana transactions that occurred in Houston.

The only other evidence offered by the government concerning Jose's activities involved testimony from employees of the Carrousel Motel and Southwestern Bell Telephone Company. The government introduced evidence that phone number 512–464–5157 was listed in the name of Jose Solis and that phone number 713–649–9338 was the number of a public telephone in the Carrousel Motel in Houston. Registration records of the Carrousel Motel were introduced to show that a room listing two occupants was registered to Simon Almendarez, alleged to be the same person as Alvarez. The telephone company records showed that two phone calls had been made from the public telephone at the motel to Weslaco around 4:00 a. m., and that soon thereafter a phone call from Jose Solis' house was made to the public telephone. There was no testimony as to who made and who received these calls.

Up to this point there was not a shred of evidence mentioning Jose Solis personally in connection with the 1977 events.

Francisco Solis took the stand to deny all the testimony related by Esquivel and to lay a foundation of prejudice and bias against him by Esquivel involving a prior horse trading deal that had provoked misunderstanding between the two. On cross-examination Francisco admitted that he had been convicted of possessing 1050 pounds of marijuana on a previous occasion in 1974. For this offense he was given five years probation and a $7,500 fine. Further cross-examination testimony, prompted by the Court itself, revealed that Jose had been convicted with Francisco in this 1974 offense.

Q. Where were you convicted of dealing in 1,050 pounds of marijuana?

A. I was convicted in Houston.

Q. Were you convicted by yourself?

A. No, we were convicted—

MR. WEISFELD: He can testify to what he knows, Your Honor, but what he knows.

THE COURT: Was somebody else in the case with you?

THE WITNESS: Yes, it was Juan Jose Maria, Luis Vargas and Graciano Garza.

This testimony prompted numerous objections from the defense attorneys and requests that the testimony be stricken. The Court overruled all objections. No jury instruction concerning this testimony was requested or granted at that time. At the close of the evidence of the case, however, the Court and the attorneys discussed the damage that might have arisen from the statement about Jose made by his brother Francisco. At that time the Court noted that the full name of the appellant, Jose

Maria Rios Solis, was not mentioned. The Court maintained that only his first name had been mentioned and no brother relationship had been brought to the attention of the jury. The defense attorneys then turned down the opportunity for any later instruction to the jury for fear that a re-emphasis of the prior conviction of Jose would do more harm than good. Motions for a mistrial were denied at that time.

We conclude that as to the offense charged Jose was not convicted on insufficient evidence. He was convicted on no probative evidence at all.

The government did not prove that the defendant knew of the marijuana conspiracy in question. It offered no proof that with that knowledge Solis intentionally did anything in furtherance of the conspiracy. There was a telephone call from someone at Jose's house to the pay phone in Houston but no proof as to who made the call or what it was about.

What Solis did in 1974 or 1976 could not, and did not, without more, supply substantive proof, directly or by inference, that he knew of the conspiracy afoot in 1977 or that he committed an overt act which was intended to further, or did further, the conspiracy.

Moreover, the proof showed that the marijuana transaction arose in Houston and was concluded there, while only Juan Solis and Davis Solis were mentioned in connection with the trip which got Esquivel caught at Sarrita.

In *United States v. Malatesta*, 590 F.2d 1379 (5 Cir., en banc, 1979), we banished the "slight evidence" rule which had been used and applied in this Circuit since 1969.

In the course of that opinion we stated, 590 F.2d at 1381:

> ■ We begin with the premise that to be convicted of an unlawful conspiracy a defendant must have knowledge of the conspiracy and must intend to join, or associate himself with the objectives of, the conspiracy. Moreover, "conspiracy to commit a particular substantive offense cannot exist without *at least* that degree

of criminal intent necessary for the substantive offense itself", *Ingram v. United States*, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959).

■ Since knowledge, actual participation, and criminal intent are the necessary elements of the crime of conspiracy, the government must, of course, prove each of those elements beyond a reasonable doubt, *Patterson v. New York*, 432 U.S. 197, 204–216, 97 S.Ct. 2319, 2324–30, 53 L.Ed.2d 281 (1977); *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970); *United States v. Salinas-Salinas*, 5 Cir. 1977, 555 F.2d 470, 473.

■ That being so, the jury in a criminal conspiracy trial must be so instructed, *United States v. Brasseaux*, 5 Cir. 1975, 509 F.2d 157; *United States v. Marionneaux*, 5 Cir. 1975, 514 F.2d 1244; *United States v. Hall*, 5 Cir. 1976, 525 F.2d 1254. In these cases we condemned the giving of a "slight evidence" instruction to a jury in a criminal conspiracy trial.

We concluded as follows:

■ The general rule of application is that

> "[t]he verdict of a jury must be sustained if there is *substantial evidence*, taking the view most favorable to the Government to support it" (emphasis added).

*Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974).

This conviction is reversed and the case is remanded to the District Court with directions to enter a judgment of acquittal.

REVERSED.