THE PEOPLE OF THE CITY OF BELLEVILLE, Plaintiff-Appellee, v. FAMILY VIDEO MOVIE CLUB, INC., d/b/a Family Video, Defendant-Appellant.

Fifth District    No. 5—99—0363

Opinion filed January 31, 2001.

Roger B. Webber, of Beckett & Webber, P.C., of Urbana, and Paul J. Cambria, Jr., and Roger W. Wilcox, Jr., both of Lipsitz, Green, Fahringer, Rolls, Salisbury & Cambria, L.L.P., of Buffalo, New York, for appellant.

Patrick M. Flynn, Assistant City Attorney, of Belleville, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

After a jury trial in the circuit court of St. Clair County, Family Video Movie Club, Inc., doing business as Family Video (defendant), was found guilty of two violations of the obscene literature ordinance of the plaintiff, the City of Belleville (City), after a Belleville police officer rented two adult videos from defendant. The jury assessed a fine of $1,000 on each count, and the trial court entered judgment on the verdict. On appeal, defendant contends that (1) the trial court erred in finding that the police did not seize the videotapes in issue and in denying defendant's motion to suppress the videotapes, (2) the trial court abused its discretion in refusing to admit defendant's proffered evidence of a community standard, (3) the trial court erred in refusing defendant's instruction No. 3, (4) the fine imposed against defendant was improper, (5) remarks by the City prosecutor during closing argument were improper and substantially prejudiced defendant, (6) the two videotapes in issue are not obscene, and (7) the City's obscenity ordinance is unconstitutional. We reverse and remand.

## BACKGROUND

On November 11, 1997, Detective William Lautz of the Belleville police department opened a membership account with defendant and rented two adult videotapes from defendant's store located in Belleville. Detective Lautz took the videos, *Where the Boys Aren't, No. 7*, and *The Ultimate Pool Party No. II*, back to the station and viewed portions of both. He then returned to defendant's store and issued two citations for alleged violations of the City's obscene literature ordinance to Jeffrey Moore, the clerk who rented the videos to him.

Prior to the trial, the ordinance violations were consolidated, and defendant was substituted as the defendant for Jeffrey Moore. Defendant filed a motion to suppress evidence and return the seized property on the basis that a search warrant was neither sought nor issued for the videotapes. The parties entered into a written stipulation in which it was agreed that Detective Lautz "turned said videotapes over to the Belleville Police Department and, further, that on or about November 20, 1997, he advised employees of Family Video that the said movies had been confiscated by the Belleville Police Department." The trial court denied defendant's motion to suppress, finding that the detective's actions did not constitute a seizure within the meaning of the fourth amendment.

Defendant also filed a motion to dismiss, arguing that the City's obscenity ordinance is unconstitutional. The trial court denied defendant's motion to dismiss, relying on *City of Belleville v. Morgan*, 60 Ill. App. 3d 434, 376 N.E.2d 704 (1978), which found the City's obscenity ordinance constitutional. The case proceeded to jury trial.

At the trial, Detective Lautz testified that he rented the two X-rated adult videos from defendant at a cost of $4. Lautz acknowledged that the store from which he rented the videos has a separate adult section in the back of the store that is partitioned off as its own room with doors. Detective Lautz explained to the jury that he "briefly observed the contents on both these tapes" at the police station and then went back to the store, where he issued two citations to the clerk who rented him the movies. The jury then viewed both films rented by Detective Lautz. The City offered no further witnesses.

Defendant's first witness was Dr. Judith Huffman Seifer, a certified sex therapist with a Ph.D. in sex research. Dr. Seifer studied with Masters and Johnson at the Reproductive Biology Research Foundation in St. Louis, Missouri, and the Institute for Advanced Study of Human Sexuality in San Francisco, California. Dr. Seifer was one of the developers and hosts of the Better Sex video series, which she claimed is America's best-selling adult sex education video series. She has been involved in numerous research studies, including, *inter alia*, incest, zoophilia, which is sexual behavior between humans and animals, and a study commissioned by Weight Watchers to study the impact of weight and sexual function. She participated in a study of sex and the married woman published in 1982 by Playgirl magazine, in which she studied 75 women in southern Illinois. She has also conducted sexual research in Ohio, Kentucky, West Virginia, and California.

Dr. Seifer opined, "[There are] differences in people's tolerance levels and comfort levels with sexually explicit material, but it's more

dependent on their age and their educational level than it is their geographic location where they live in the United States." She testified that women are not as intrigued by adult videos as men but are "tolerant" of the videos and that "a majority of adult videos of the x-rated genre videos are now rented by women from video rental stores." Dr. Seifer viewed the videos four times in preparing for her testimony. She opined that both films have scientific value.

With regard to *The Ultimate Pool Party No. II*, Dr. Seifer testified that the movie has educational value for both men and women because it depicts group sex and oral sex, which are topics on which there is little information available. With respect to *Where the Boys Aren't, No. 7*, Dr. Seifer opined that the movie would help educate women who were curious about same-sex encounters and lesbian relationships. In her opinion, the movie also had scientific value because of the number of women in it who had breast implants. She believes that every woman considering breast implants should watch 15 minutes of this film in order to find out what the results would look like.

Dr. Seifer believes that both films could be valuable to certain couples in sex therapy or marriage counseling. Sometimes she has assigned clients involved in sex therapy the task of watching an adult video and then discussing what they have witnessed. She testified that she "would much rather have people vicariously experience something like that with the person they'd perhaps like to [sexually] experiment with" rather than be traumatized by physically participating in something they really did not want to do. Dr. Seifer opined that neither film appealed to the prurient interest in sex and that the average individual would probably become bored with the movies after approximately 15 minutes. Dr. Seifer believed that some people might be uncomfortable watching the behavior depicted in the film, but she did not think the average individual would find either movie patently offensive.

Dr. Seifer expected to be paid a minimum of $5,000 for her testimony. She has testified in other obscenity cases, but she said, "[There are] more films that I view that I refuse to testify about or testify for the defendant than there are videos that I agree to testify on." She will not testify on behalf of films that are violent, deal with sex between children and adults or even create the illusion thereof, or involve bestiality.

Roy Williams, regional manager for defendant, testified that defendant is the seventh largest national chain of video stores in the United States and the largest family-owned chain. There are 133 stores in the United States, and they are all essentially laid out in the same manner and carry the same types of videos, which are new releases,

general titles, children's, sports and fitness, education, and adult. Williams testified that defendant has always carried adult videos. The adult videos are separated from the other videos and are located in an entirely different room. Defendant does not allow anyone under 18 years of age to become a member, nor does defendant allow children under the age of 18 who are signed up under their parents' account to rent any X-rated or adult video.

Williams testified that defendant's Illinois stores make anywhere from 4% to 15% of their total revenue from adult video rentals, depending on the store. With regard to the store in question, in June 1998 there were net receipts of $32,613, of which $2,856 was generated from the rental of adult videos. William testified that this equaled approximately 11% of the rental revenues. On cross-examination, the prosecuting attorney pointed out that the percentages from adult rentals appeared to be incorrect based upon the total dollar amounts described. Williams could not explain the apparent discrepancies and concluded that he would need to check with the programmers to find out exactly what the percentages represented.

Outside the presence of the jury, defendant made an offer of proof concerning a series of petitions circulated at the Belleville store, which the trial court ruled were inadmissible. During the offer of proof, Mr. Williams explained that after the Belleville store was issued citations, numerous customers commented favorably upon defendant's offering of adult videos. In response, the store drafted two petitions for customers to sign to voice either their approval or disapproval of defendant's offering of adult videos. The first petition read as follows:

"I AM IN FAVOR OF FREE SPEECH AND DO NOT SUPPORT THE CITY OF BELLEVILLE'S ANTI-OBSCENITY ORDINANCE AS IT RELATES TO FAMILY VIDEO.

I DO SUPPORT FAMILY VIDEO'S STRUGGLE TO BE ABLE TO RENT ADULT VIDEOS TO THEIR CUSTOMERS WHO WANT THEM."

The second petition read as follows:

"I DO NOT SUPPORT FAMILY VIDEO'S ATTEMPT TO RENT OR SELL ADULT VIDEOS."

The petitions were kept underneath the store's counter. Employees were instructed to offer customers a chance to sign either petition if a customer raised the issue. The trial court refused to allow defendant to present testimony about the petitions or to admit them into evidence.

Prior to the trial, the court granted a motion *in limine*, barring the testimony of David Ybarra, a law student employed by defense counsel, who had conducted an investigation into the availability of

sexually explicit materials throughout central and southern Illinois. Defendant made an offer of proof concerning Ybarra's testimony in which Ybarra explained that he visited nine cities in central and southern Illinois looking for adult and general video stores. He went to Bloomington, Charleston, Champaign, Freeburg, Lebanon, Mascoutah, Matoon, and O'Fallon. Of these nine cities, three had at least one exclusively adult video store, and all nine had at least one general video store that offered adult videos.

Ybarra purchased videos, marked as defendant's exhibits 11 and 12, and described the stores from which he had purchased them. Both were purchased at stores located in Champaign. Ybarra categorized the movies available for sale or rent at the video stores into the different types of sexual conduct displayed in the videos. According to Ybarra, the videos that he purchased were no different in terms of sexual candor or the type of sexual conduct depicted than the videos in issue at the trial. Ybarra made a detailed report of his observations, which included, *inter alia*, the average number of customers, whether or not females were present in the stores when he visited, what type of attire the customers wore, and what types of materials were available. The report and the two videos Ybarra purchased were introduced into evidence for the purpose of completing the offer of proof.

Roy Williams was recalled as a witness in an attempt to clarify the percentage of revenue that defendant's Illinois stores made from the rental of adult videos. Williams testified that adult video rentals at the Belleville store in June 1998 generated $2,856 or 11% of the total movie rental revenue, in July 1998 generated $3,217 or 12%, in August 1998 generated $3,680 or 14%, and in September 1998 generated $3,538 or 17%. Williams further testified that every one of defendant's stores contains an adult section. At one time, defendant opened a store in Bourbonnais, Illinois, without an adult section, and it failed to meet its projected revenue levels in its initial months in operation. The store made several efforts to increase its revenues but was unable to do so until it included an adult section in that store. Once the adult section was added, the store immediately increased its revenue, for all types of movie rentals, to the levels originally projected.

An informal jury instruction conference was held off the record prior to the final presentation of evidence and closing arguments. A record was later made to show what transpired during the informal conference. The City presented instructions based upon civil pattern jury instructions, while defendant presented instructions based upon criminal pattern jury instructions. Defendant's proposed instructions were modified to reflect a lower burden of proof.

After hearing all the evidence and arguments, the jury returned

guilty verdicts and assessed a fine of $1,000 on both counts, the maximum fine allowable. The trial court entered judgment on the verdict. Defendant filed a timely posttrial motion, which the trial court denied. Defendant also filed a motion to vacate judgment and reconsider sentence, in which it was alleged that only one judgment of conviction and one fine should have been allowed under the circumstances. This motion was also denied. Defendant now appeals.

## ANALYSIS

### I. Motion to Suppress

The first issue we are asked to consider is whether the trial court erred in finding that the police did not seize the videotapes and in denying defendant's motion to suppress. Defendant contends that its employees transferred only a temporary possessory interest in the two videos and that when Detective Lautz failed to return the two videos at the end of the rental period, an unreasonable seizure occurred. Defendant insists that the seizure of the videos required a warrant and that because no warrant was issued, the seizure was unlawful and the videos should have been excluded from trial. We disagree.

■ We recognize that in order to insure that unconditionally protected speech is not unlawfully seized and suppressed, exceptions to the warrant requirement, possibly acceptable in other contexts, are unacceptable for the seizure of allegedly obscene material. "Otherwise, police officers could seize any publication or film they deem to be unprotected by the First Amendment ***." *United States v. Hale*, 784 F.2d 1465, 1469 (9th Cir. 1986). For this reason, the Supreme Court has noted that the seizure of an article protected by the first amendment may "invoke[ ] *** Fourth Amendment warrant requirements because [the Supreme Court] examine[s] what is 'unreasonable' in the light of the values of freedom of expression." *Roaden v. Kentucky*, 413 U.S. 496, 504, 37 L. Ed. 2d 757, 764-65, 93 S. Ct. 2796, 2801 (1973). "A seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material." *Roaden*, 413 U.S. at 501, 37 L. Ed. 2d at 763, 93 S. Ct. at 2800.

In *Roaden*, the Supreme Court overturned the conviction of a drive-in theater manager for exhibiting an allegedly obscene film because, at the time of the defendant's arrest, the arresting officers violated the fourth amendment by seizing a film being shown at the drive-in without first obtaining a warrant. Two factors were crucial to the Supreme Court's determination: (1) the seizure of a film then being exhibited to the general public worked as an impermissible "prior restraint of the right of expression" (*Roaden*, 413 U.S. at 504, 37 L.

Ed. 2d at 764, 93 S. Ct. at 2801), and (2) the judgment of the arresting officer alone was insufficient to insure that the film was contraband obscenity (*Roaden*, 413 U.S. at 506, 37 L. Ed. 2d at 765-66, 93 S. Ct. at 2802). *Roaden* makes it clear that a line must be drawn in addressing the seizure of allegedly obscene materials.

However, in *Maryland v. Macon*, 472 U.S. 463, 86 L. Ed. 2d 370, 105 S. Ct. 2778 (1985), relied on by the trial court in denying defendant's motion to suppress, the Supreme Court distinguished *Roaden* and other similar cases on the basis that in some cases there are "special constraints on searches for and seizures of presumptively protected [first amendment] material" where the fourth amendment is not even triggered. 472 U.S. at 468, 86 L. Ed. 2d at 376, 105 S. Ct. at 2781. In *Macon*, undercover detectives entered an adult bookstore and purchased two magazines. After concluding that the magazines were obscene, the detectives returned to the bookstore and arrested the clerk for selling obscenity. The *Macon* Court rejected the defendant's argument that the magazines should have been suppressed as being the product of a warrantless search and seizure, and it distinguished *Roaden* on the basis that in *Roaden* there unquestionably had been a "search" or "seizure" under the fourth amendment, calling for consideration of the first amendment context, whereas under the facts in the case before it no search or seizure had occurred.

The *Macon* Court reasoned that the police officers did not search the bookstore within the meaning of the fourth amendment because they merely entered the store and examined its wares, as would any other customer, nor did the police officers seize the magazines within the meaning of the fourth amendment because the clerk "voluntarily transferred any possessory interest he may have had in the magazines to the purchaser upon receipt of the funds." 472 U.S. at 469, 86 L. Ed. 2d at 377, 105 S. Ct. at 2782. "Absent some action taken by government agents that can properly be classified as a 'search' or a 'seizure,' the Fourth Amendment rules designed to safeguard First Amendment freedoms do not apply." *Macon*, 472 U.S. at 468-69, 86 L. Ed. 2d at 376, 105 S. Ct. at 2781. Likewise, in the instant case neither a search nor a seizure occurred.

■ Here, Detective Lautz entered defendant's place of business located in Belleville, browsed its contents, opened a membership account, and rented two videos at a cost of $4. Defendant's store was open to the general public, and the public was invited to enter and rent movies. Defendant's policy not to rent adult movies to anyone under 18 years of age did not apply to Lautz. Lautz's actions in no way infringed upon defendant's legitimate expectation of privacy. To the contrary, defendant welcomes customers to its stores in the hope

that the customer will rent a video. Therefore, there was not an illegal search. Moreover, contrary to defendant's assertions, Detective Lautz did not seize the videos. Instead, he opened a membership account and paid the rental fee to the clerk at the desk. Defendant, through its employee, voluntarily transferred its possessory interest in the video when the rental fee was paid. Defendant recognizes that it did voluntarily transfer its possessory interest in the video, but it contends that the video was illegally seized within the meaning of the fourth amendment when Lautz failed to return the videos at the end of the rental period. Again, we look to *Macon* to guide our analysis.

In *Macon*, the magazines were purchased by the police officers. Nevertheless, the defendant argued that the *bona fide* nature of the purchase evaporated because the police officers later went back and seized the marked $50 bill and failed to return the change. 472 U.S. at 470, 86 L. Ed. 2d at 377-78, 105 S. Ct. at 2782. The Supreme Court disagreed, finding that the sale was "not retrospectively transformed into a warrantless seizure by virtue of the officer's subjective intent to retrieve the purchase money to use as evidence." *Macon*, 472 U.S. at 471, 86 L. Ed. 2d at 378, 105 S. Ct. at 2783. " 'The exclusionary rule enjoins the Government from benefiting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality.' " *Macon*, 472 U.S. at 471, 86 L. Ed. 2d at 378, 105 S. Ct. at 2783, quoting *United States v. Crews*, 445 U.S. 463, 475, 63 L. Ed. 2d 537, 548, 100 S. Ct. 1244, 1252 (1980).

In the instant case, the videos were lawfully in the police officer's possession prior to a citation being issued. The rental of the videos by Detective Lautz was not retroactively transformed into a warrantless seizure simply because the videos were not returned. The videos were lawfully obtained by the police and need not be excluded from evidence. The exclusionary rule comes into play only when evidence has been obtained by an unreasonable search and seizure, and the facts of this case indicate that Detective Lautz did not obtain possession of the allegedly obscene videos by means of an unreasonable search or seizure. The videos were not the fruit of an illegal arrest. Accordingly, the trial court did not err in refusing to suppress the videotapes. The videotapes were properly admitted into evidence, and the cause need not be reversed on this issue.

## II. Proffered Evidence of a Community Standard

The next issue raised by defendant is that the trial court erred in refusing to admit defendant's proffered evidence to show a degree of acceptability within the community of the types of materials on trial. Defendant insists that the trial court abused its discretion in (1) refus-

ing to admit petitions signed by defendant's patrons that showed support for defendant's offering of adult videos and (2) refusing to admit the results of a survey conducted by a law clerk employed by defense counsel. We agree.

■ The City's obscenity ordinance under which defendant was convicted provides in pertinent part:

> "(b) A thing shall be deemed to be obscene if the average person would find that the work taken as a whole appeals to a prurient interest[ ] and the work depicts or describes patently offensive representations or descriptions of nude persons, ultimate sexual acts, normal or perverted sexual conduct, whether actual or simulated, or patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the human genitals. The work, taken as a whole, must lack serious literary[,] artistic, political, or scientific value."

The ordinance in question requires the trier of fact to determine whether the material is "obscene," a determination that does not lend itself easily to the judicial process. It is well settled that before a work can be adjudged obscene, a trier of fact must determine "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest [citations]; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. 15, 24, 37 L. Ed. 2d 419, 431, 93 S. Ct. 2607, 2615 (1973). All three prongs of the *Miller* test must be met, and "[t]hus, a work, though a valueless piece appealing to the prurient interest, will not be deemed obscene unless it is patently offensive according to contemporary community standards, *i.e.*, in the judgment of the 'average person in the community, rather than the most prudish or the most tolerant.' " *United States v. Various Articles of Obscene Merchandise, Schedule No. 2101*, 709 F.2d 132, 135 (2d Cir. 1983), quoting *Smith v. United States*, 431 U.S. 291, 304, 52 L. Ed. 2d 324, 337, 97 S. Ct. 1756, 1765 (1977).

■ Determining contemporary community standards is no easy task, but clearly the parties may introduce relevant evidence of the prevailing community standard. *Miller*, 413 U.S. at 31 n.12, 37 L. Ed. 2d at 435 n.12, 93 S. Ct. at 2619 n.12. The State does not have the burden of introducing any evidence concerning what the community standard is (*Hamling v. United States*, 418 U.S. 87, 104, 41 L. Ed. 2d 590, 613, 94 S. Ct. 2887, 2901 (1974)), but that does not justify a court denying the defendant the right to introduce the best evidence he can

gather on this issue. *People v. Nelson*, 88 Ill. App. 3d 196, 199, 410 N.E.2d 476, 479 (1980). It is well established that the admission of evidence lies within the sound discretion of the trial court, and its decision will not be reversed absent a clear showing of an abuse of that discretion. *People v. Ward*, 101 Ill. 2d 443, 455-56, 463 N.E.2d 696, 702 (1984).

In *People v. Nelson*, 88 Ill. App. 3d 196, 410 N.E.2d 476 (1980), the Second District held that it was reversible error for the trial court to exclude a survey of a sample of the adult population regarding the acceptability of depictions of sexually explicit materials. 88 Ill. App. 3d at 197-200, 410 N.E.2d at 478-79. The *Nelson* court determined that the survey questions and answers were relevant because they showed that a majority of Illinois residents found depictions of nudity and actual or pretended sexual activities acceptable. 88 Ill. App. 3d at 198, 410 N.E.2d at 478-79. The *Nelson* court concluded that survey evidence may be the only way to prove degrees of acceptability of sexually explicit material as compared to its availability. 88 Ill. App. 3d at 199, 410 N.E.2d at 479. The *Nelson* court stated: "The State does not have the burden of introducing any evidence as to what the statewide community standard is. [Citations.] But that cannot justify a court in denying the defendant the right to introduce the best evidence he can gather on this issue. Essentially the result of refusing the proffered evidence left the jurors with no way of knowing what the State standard might be." 88 Ill. App. 3d at 199, 410 N.E.2d at 479. The *Nelson* court went on to explain, "This raises the great danger that the jurors may have applied a personal standard rather than a statewide community standard." 88 Ill. App. 3d at 199-200, 410 N.E.2d at 479.

In *People v. Thomas*, 37 Ill. App. 3d 320, 346 N.E.2d 190 (1976), our colleagues in the Third District pointed out that the trend today is to admit public polls and surveys, despite their hearsay character, because the technical adequacy of a survey is a matter running to the question of the weight to be given such evidence, not its admissibility. 37 Ill. App. 3d at 326, 346 N.E.2d at 194. Nevertheless, the *Thomas* court concluded that the foundation in that case was insufficient to warrant the admission of 180 cards filed in response to a survey of a film alleged to be obscene because it did not disclose, *inter alia*, the exact number of persons polled and the manner used to select those to be polled. 37 Ill. App. 3d at 326, 346 N.E.2d at 195.

In the instant case, the State failed to offer any evidence of a community standard, but the defense offered a survey conducted in its Belleville store in which patrons who commented on the obscenity citation were asked whether they would like to sign a petition in support of or in opposition to defendant's offering of adult videos. Ap-

proximately 97 patrons signed the petition in support of defendant, and three patrons signed the petition in opposition. Roy Williams explained that only those who voluntarily commented on the obscenity citation were asked if they wanted to sign a petition. It is doubtful that a majority had actually viewed the films in question, and the technical inadequacy of the poll is obvious. Nevertheless, we most likely would have permitted the defense to introduce the petitions in the instant case and allowed the City to point out the flaws in the methodology used by defendant. Notwithstanding our disagreement with the trial court on this issue, we find that the refusal to admit the petitions into evidence was, at worst, harmless error because they were virtually worthless as an indicator of a community standard. However, the same cannot be said about the survey conducted by the law clerk.

■ In contrast to the petitions, the survey conducted by the law clerk for defense counsel had a more valid basis as evidence of a community standard. David Ybarra was working as a law clerk for defense counsel when he was assigned the task of investigating the availability of sexually explicit adult videos in Illinois. Ybarra eventually traveled to nine cities in central and southern Illinois, where he visited video stores that offered adult videos to its customers. The completed survey indicates that all nine cities offer videos similar to the two videos rented by Detective Lautz. The survey also indicated what type of patrons were in the stores when he entered, whether females were present in the stores he visited, and what types of other materials were available in those stores. Defendant also included in its offer of proof two adult videos, *Dildo Debutantes* and *Wet Nurses*, purchased by Mr. Ybarra at two separate video stores in Champaign. Mr. Ybarra viewed the videotapes he purchased, as well as the two adult videos in issue in this case, and he stated that there was no difference in the degree of sexual candor or the types of sexual conduct depicted between the two videos he purchased and the two videos on trial.

While it is true that the mere availability of similar materials in an area does not demonstrate that they are acceptable to the average member of the community (*Hamling*, 418 U.S. at 125-26, 41 L. Ed. 2d at 625, 94 S. Ct. at 2911), the availability of the same or comparable materials in the area may indicate that the challenged materials "enjoy a 'reasonable degree of community acceptance'" (*Various Articles of Obscene Merchandise, Schedule No. 2101*, 709 F.2d at 137, quoting *United States v. Manarite*, 448 F.2d 583, 593 (2d Cir. 1971)). By refusing to allow defendant the opportunity to present evidence of Ybarra's survey, the trial court denied defendant the right to introduce the best evidence it offered on the issue of a community standard. Because of

the trial court's refusal to admit the survey and the two videos purchased by Ybarra in Champaign, the jurors had no evidence before them indicating what the community standard might be. While defendant's expert, Dr. Seifer, touched upon the subject, her testimony concentrated on the serious or scientific value of the content of the films, not on whether the films enjoyed an acceptance by the community. Accordingly, of necessity, the jurors applied a personal standard rather than a community standard. See *Nelson*, 88 Ill. App. 3d at 199-200, 410 N.E.2d at 479. We believe that the exclusion of the survey conducted by Mr. Ybarra was prejudicial to defendant and requires that the cause be remanded for a new trial.

## III. Constitutionality

■ Defendant also contends that the City's ordinance is unconstitutional because its provisions are vague and imprecise. This same contention was examined and rejected in *City of Belleville v. Morgan*, 60 Ill. App. 3d 434, 376 N.E.2d 704 (1978), and we find that decision controlling here.

## IV. Conclusion

Because of our determination that the trial court committed reversible error when it refused to admit into evidence the survey conducted by the law clerk, we need not address the additional issues raised by defendant.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is hereby reversed, and the cause is remanded for a new trial.

Reversed; cause remanded.

CHAPMAN, P.J., and RARICK, J., concur.